[No. 43642.   En Banc.   November 23, 1977.]

WASHINGTON STATE COMMERCIAL PASSENGER FISHING VES-
SEL ASSOCIATION, *Respondent,* v. THOR TOLLEFSON,
ET AL, *Appellants.*

WASHINGTON KELPERS ASSOCIATION, *Respondent,* v.
THOR TOLLEFSON, ET AL, *Appellants.*

*Slade Gorton, Attorney General,* and *James M. Johnson* and *Dennis D. Reynolds, Assistants,* for appellants.

*Thom, Navoni, Hoff, Pierson & Ryder,* by *Richard W. Pierson* and *Dale L. Kingman,* for respondents.

ROSELLINI, J.—The majority of this court in *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 87 Wn.2d 417, 553 P.2d 113 (1977), held that the case was moot, since the regulations involved, which were adopted in 1974, have been superseded and are now without force or effect. Upon rehearing, the majority has decided that we should address ourselves to the questions raised on appeal, because they are of a recurring nature and of public importance.

The Washington State Commercial Passenger Fishing Vessel Association (hereinafter referred to as respondent) obtained in the Superior Court a declaration that State fisheries regulations WAC 220–56–013 and –063, which reduced from three to two the daily limit of salmon which a sports fisherman was permitted to catch in ocean waters, were invalid. We sustain that judgment.

Sports fishing for salmon off the Washington and Oregon coast has been a major recreational pursuit for a number of years. Charter boats are taken for hire by sports fishermen in Washington coastal areas for the purpose of catching chinook and coho salmon. The 350 to 400 charter boats constitute a major industry in the area of Ilwaco and Westport on the southern coast of Washington and all of the Olympic Peninsula ports, including Neah Bay, Sekiu, La Push, Agate Beach, Port Angeles, and others. There also exists a charter boat industry in Astoria and other Oregon

fishing ports in the vicinity of the Columbia River which are directly in competition with Ilwaco and indirectly competing with the Westport charter fleet.

At the hearing in the Superior Court, the director was questioned with regard to the reason for the regulations, and stated that they were adopted in response to a decision by Federal District Judge George C. Boldt in *United States v. Washington,* 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd,* 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976), holding that treaties between the treaty Indians and the United States gave the tribes the right to take a certain percentage of the fish in certain coastal streams. He was asked:

> Q. Were there any other factors for the department and yourself with respect to the regulatory enactments that were adopted in complying with the Boldt Decision? . . . A. Were it not for the Boldt Decision, we would not have taken this action.

He further testified:

> Q. What was the effect of the regulations designed with respect to the coastal areas? A. It was designed to put more fish into the coastal Indian streams.

He testified that the regulation, in conformity with Judge Boldt's ruling, was designed to significantly reduce non–Indian fishing in order to make more fish available to the Indians.

The court made the finding that the regulations were passed solely as a result of the Boldt decision and not in furtherance of the director's powers and duties under the Washington statutes which created his office. These relate to the conservation and preservation of the fishery of the State. The court found that the respondents were irreparably damaged; that there was a sharp decrease in the number of sports fishermen carried on the charter boats, which necessitated a 3– to 6–week recovery period, and that the respondents suffered economic loss. The Superior Court also took note of the fact that the United States District

Court ordered the director to make a significant reduction in non–Indian fishing.

The issues raised by this appeal are: (1) Does the director of the Department of Fisheries have the statutory power to make an unequal allocation of fish among members of the same class of user? (2) Can a Federal District Court order a state official to act beyond the powers vested in the state official by the legislature? and (3) May Congress and the executive department, by treaty, or may a court of law, in interpreting a treaty, ignore and supersede provisions of the federal constitution?

The first two questions were answered in the negative in *Puget Sound Gillnetters Ass'n v. Moos,* 88 Wn.2d 677, 565 P.2d 1151 (1977). *See also Purse Seine Vessel Owners Ass'n v. Moos,* 88 Wn.2d 799, 567 P.2d 205 (1977).

The third, though involving fundamental concepts, has not been argued in this court before.

The Federal District Court in *United States v. Washington, supra,* allocated to the treaty Indians more than 50 percent of the harvestable catch, to wit: the right to take 50 percent of the harvestable salmon and steelhead, plus all of the fish that the Indians can catch on the reservation, where they are not regulated by the State,[1] plus all that they can eat, and all they need for ceremonial purposes.

In addition, under the court's order, the share of salmon and steelhead allocated to the Indians is to be increased by

> [a]n additional equitable adjustment, determined from time to time as circumstances may require, to compensate treaty tribes for the substantially disproportionate numbers of fish, many of which might otherwise be available to treaty right fishermen for harvest, caught by non–treaty fishermen in marine areas closely adjacent to but beyond the territorial waters of the State, or outside the jurisdiction of the State, although within Washington waters.

*United States v. Washington, supra* at 344.

---

[1]Except as provided in *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977).

The Federal District Court ruled that treaty Indians are to be entitled to fish at other than traditional fishing grounds and

[i]f a tribal member fishes in the all–citizen fishery at a location which is not a usual and accustomed ground or station of his tribe, that individual's catch will not count toward the tribal off–reservation share.[2]

*United States v. Washington, supra* at 410.

The Federal District Court found all the above rights from its interpretation of article 3 of the Treaty of Medicine Creek, 10 Stat. 1132, 1133 (1854), which states:

The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, *in common with all citizens of the Territory* . . .

(Italics ours.)

Does the treaty, as thus interpreted, deny to citizens of the state the equal protection of the laws guaranteed under U.S. Const. amend. 14? In exploring that question, it is necessary to take into consideration the following facts:

The number of treaty Indians living in the case area, as identified by the Federal District Court, in proportion to the number of other persons living in the area, is .028 percent. The number of treaty Indians living on the reservation is less than .007 percent of the total tribal membership. The Federal District Court found that only 794 treaty Indians engaged in commercial fishing. The entire population in the Federal District Court case area was 2,243,069. In Western Washington alone there are 6,600 commercial fishermen and 283,650 sports fishermen.

Thus, it is apparent that the court awarded over 50 percent of the state's natural resources to a group of its citizens comprising less than 1 percent of the population of the

---

[2]To enforce the federal decision, the Federal District Court proposed to use state resources and the state's power to regulate the taking of fish. Under its orders, the state regulations were not to be confined to or limited to conservation and preservation purposes, or to balancing the interest in on– and off–reservation fishing with conservation measures. The State was required to regulate the taking of fish in offshore waters, which were not a part of the treaty Indians' usual and accustomed fishing grounds, to increase the supply of fish at those places.

area involved in the decision. The decision was based upon a treaty made not with a foreign nation, but with inhabitants of this Nation who were ancestors of the Indian claimants in this action. The allocation was one which had no precedent in the interpretation of Indian treaties. It had the effect of injecting a new provision into the treaties.

■ We think that there can be no doubt that were the executive department to enter into a treaty with a foreign nation or were the Congress to pass a law which allocated a portion of a state's natural resources to a group of its citizens, based upon their race or ancestry, that provision would be struck down as a denial of equal protection of the laws. The United States Supreme Court has observed that the language of the treaty, "in common with all citizens of the Territory", invokes the principles of equal protection. *Department of Game v. Puyallup Tribe, Inc.*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (*Puyallup* II), was remanded with an admonition that *the issue of equal protection is implicit in the term "in common with" as used in the treaty.*

In *Puyallup Tribe, Inc. v. Department of Game*, 391 U.S. 392, 403, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968) (*Puyallup* I), the court had also stated with respect to the term "in common with":

[W]e only add that any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase "in common with."

Granted the equal protection clause of the Fourteenth Amendment does not mandate complete equality. But it cannot be seriously argued that an allocation of more than 50 percent of a natural resource of a state to a group of citizens comprising a little more than .028 percent of the population does not deny such protection.

■ The appellants agree that the result achieved by the Boldt interpretation, were it enacted as a law, would run afoul of constitutional prohibitions. They suggest, however, that the allocation is immune from constitutional restriction because treaties are the supreme law of the land and

are binding within the territorial limits of the United States. While it is true that a treaty is the supreme law of the land under U.S. Const. art. 6, the constitution stands above the treaty in the order of supremacy.

U.S. Const. art. 6 reads, in part:

> *This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land;* and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any *state* to the contrary notwithstanding.

(Italics ours.)

To test the notion that a treaty may supersede the constitution, let us examine a hypothetical case.

Suppose the executive branch of the government should enter into a treaty with the Vatican to the effect that all Catholic churches and schools are to be tax–supported in the United States. And suppose that the United States Senate should ratify the treaty and attempt to implement it by statutes. Would such a treaty or the implementing statutes be enforceable in the United States, in spite of the First Amendment's mandate that "Congress shall make no law respecting an establishment of religion . . ."? Can it be seriously suggested that the courts would enforce such a treaty or laws?

If treaties are indeed supreme over the constitution, the executive and the Senate can, by exercising the treaty–making power, amend the basic document so as to grant rights not found in that instrument or deny rights otherwise mandated.

If this was the intent of the framers, then not only can the exercise of the treaty power effectively amend the constitution so as to preclude the assertion of rights guaranteed under that instrument, but it could just as easily effect

a change in the structure and character of our government itself.

With respect to the supremacy of treaties over acts of Congress, the Supreme Court has said:

By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self–executing.

*Whitney v. Robertson,* 124 U.S. 190, 194, 31 L. Ed. 386, 8 S. Ct. 456 (1888).

Any notion that a treaty may violate any section of the constitution was laid to rest in *Reid v. Covert,* 354 U.S. 1, 16–17, 1 L. Ed. 2d 1148, 77 S. Ct. 1222 (1957). The court stated:

There is nothing in this language [the supremacy clause] which intimates that treaties and laws enacted pursuant to them do not have to comply with the provisions of the Constitution. Nor is there anything in the debates which accompanied the drafting and ratification of the Constitution which even suggests such a result. . . . It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights—let alone alien to our entire constitutional history and tradition—to construe Article VI as permitting the United States to exercise power under an international agreement without observing constitutional prohibitions. In effect, such construction would permit amendment of that document in a manner not sanctioned by Article V.

(Footnote omitted.)

The Supreme Court has further stated:

> The treaty is . . . a law made by the proper authority, and the courts of justice have no right to annul or disregard any of its provisions, unless they violate the Constitution of the United States.

*Doe v. Braden,* 57 U.S. (16 How.) 635, 656, 14 L. Ed. 1090 (1853). *See Geofroy v. Riggs,* 133 U.S. 258, 267, 33 L. Ed. 642, 10 S. Ct. 295 (1890); *United States v. Wong Kim Ark,* 169 U.S. 649, 700, 42 L. Ed. 890, 18 S. Ct. 456 (1898); *Asakura v. Seattle,* 265 U.S. 332, 341, 68 L. Ed. 1041, 44 S. Ct. 515 (1924).

If a treaty itself may not contravene constitutional provisions, it must follow that an interpretation of a treaty which leaves it open to constitutional objections, is likewise forbidden (*Reid v. Covert, supra*); and certainly laws or regulations which violate a constitutional provision, though they be made pursuant to the terms of a treaty, must fail.

While generally the State has no jurisdiction over persons living on Indian reservations,[3] except as ceded by Congress, its off–reservation jurisdiction has been fully recognized by the Supreme Court in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973), where it said:

> But tribal activities conducted outside the reservation present different considerations. . . . Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.

*And see Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 7 L. Ed. 2d 573, 82 S. Ct. 562 (1962), which states:

> Even where reserved by federal treaties, off–reservation hunting and fishing rights have been held subject to state regulation . . .

Both the State's Enabling Act[4] and the treaties them-

---

[3] *But see Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977).

[4] The State Enabling Act which must be read in conjunction with the treaties, *Ward v. Race Horse,* 163 U.S. 504, 41 L. Ed. 244, 16 S. Ct. 1076 (1896), and

selves (providing for the right to fish "in common") are consistent with the State's jurisdiction over its lands and waters outside the reservation, the only place we are concerned with here. This being the case, the Fourteenth Amendment has full application.

■ The equal protection clause of the Fourteenth Amendment states that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

> Congress may not authorize the States to violate the Equal Protection Clause. . . . Congress is without power to enlist state cooperation in a joint federal–state program by legislation which authorizes the States to violate the Equal Protection Clause.

*Shapiro v. Thompson,* 394 U.S. 618, 641, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969). *See also Katzenbach v. Morgan,* 384 U.S. 641, 651, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966).

Whenever the federal law requires the State to act, the State must act in conformity with the Fourteenth Amendment. This rule must also apply to all courts; otherwise, the effect is to give to the judicial branch the power to amend the constitution. This cannot be done. *Reid v. Covert, supra.*

We hold that the director of the Department of Fisheries of the State of Washington does not have authority to apportion fish to conform to the Federal District Court decision, that the Federal District Court cannot compel a state officer to act beyond his statutory authority, and that the granting of more than 50 percent of the harvestable fish to .028 percent of the population (treaty Indians) and less

---

*Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973), did not disclaim or surrender to Indians any rights to participate in the common fishery. The Supreme Court in *Martin v. Lessee of Waddell,* 41 U.S. (16 Pet.) 367, 414, 10 L. Ed. 997 (1842), stated:

> And it would require very plain language in these letters–patent, to persuade us that the public and common right of fishery in navigable waters, which has been so long and so carefully guarded in England, and which was preserved in every other colony founded on the Atlantic borders, was intended, in this one instance, to be taken away [from the inhabitants].

than 50 percent to 2,243,069 non–Indian population, violates the equal protection clause of the fourteenth amendment to the United States Constitution.

We affirm the trial court.

HAMILTON, BRACHTENBACH, and HICKS, JJ., and WIEHL, J. Pro Tem., concur.

STAFFORD, J. (concurring in the result only)—Notwithstanding the import of any dissenting or concurring opinions to the contrary, the current decisional law of this state is reflected in *Puget Sound Gillnetters Ass'n v. Moos,* 88 Wn.2d 677, 565 P.2d 1151 (1977); *Purse Seine Vessel Owners Ass'n v. Moos,* 88 Wn.2d 799, 567 P.2d 205 (1977). As indicated therein, and as pointed out in this case, the Department of Fisheries' authority to regulate the salmon fishery is limited to "conservation" purposes.

Inasmuch as the regulations adopted in 1974 have been superseded, the issue before us is moot. Ordinarily we will not resort to mootness as a means of dismissing cases involving issues of great public importance. However, the rule is not applicable here.

The instant record makes it abundantly clear the challenged regulations were not adopted for the purpose of "conservation" but were formulated solely in response to an order of the Federal District Court. That being the case, the Director of Fisheries clearly exceeded the authority granted him by the legislature. To that extent *Puget Sound Gillnetters Ass'n* and *Purse Seine Vessel Owners Ass'n* are fully dispositive of the only real issue before us. Thus, the matter not only is moot but it no longer involves a subject of great public importance, having been previously resolved in the above cited cases.

When an appeal no longer presents the question that originally warranted our retention of a moot case, we should not continue to consider it merely to discuss, by way of dicta, other matters only tangentially related thereto. Despite the temptation to consider matters beyond the

Director's power to regulate the salmon fishery, the discussion is not necessary to the decision and should be eliminated as dicta.

Accordingly, I would dismiss the appeal of the Director of Fisheries as moot.

WRIGHT, C.J., concurs with STAFFORD, J.

UTTER, J. (dissenting)—I have sailed the waters of the Pacific Ocean from Kodiak Island in the north to Maui in the south and most of the bays and inlets of this state. My sympathies are with the men and women who sail these waters and gain their livelihood from them. The oath of office which I took, however, is paramount and binds me to uphold the laws and Constitution of the State of Washington and the Constitution of the United States as well. When there is a conflict between state and federal law, the supremacy clause of the United States Constitution (U.S. Const. art. 6, cl. 2) makes binding upon the states the rulings of the United States Supreme Court. We have recently recognized in a different context that "State and local laws cannot stand if they impede, burden, or frustrate the purpose of [federal laws]." *Lindsay v. Seattle,* 86 Wn.2d 698, 708, 548 P.2d 320 (1976).

The majority opinion holds the apportionment of harvestable fish mandated by the federal courts in *United States v. Washington,* 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd,* 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976), to be violative of the equal protection clause of the fourteenth amendment to the United States Constitution and therefore not binding upon the State for the reason that treaty fishermen are not members of a distinct group justifying differential treatment. In so holding, the majority completely ignores the most basic principles of Indian treaty law developed over the past 70 years by the United States Supreme Court.

The majority embraces the argument that the treaty clause at issue in *United States v. Washington, supra,*

granting to signatory tribes the right to take fish at "usual and accustomed places in common with all citizens of the territory", violates the equal protection clause of the federal constitution unless interpreted to confer no greater rights than those held by nontreaty citizens. In so doing, the majority asserts that the issue "has not been argued in this court before." In fact, however, the argument has been advanced in substantially similar form before both this court and the United States Supreme Court on several occasions.

The Supreme Court has expressly rejected this theory on at least two occasions. Continued adherence to this discredited doctrine should be embarrassing to this court and is particularly unproductive in this case. I am convinced that, whatever may be the personal inclinations of the members of this court, continued refusal to accept the legal principles enunciated in *Department of Game v. Puyallup Tribe, Inc.*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (*Puyallup* II), *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977) (*Puyallup* III), and *United States v. Washington, supra,* will place upon us significant responsibility for whatever unfortunate events hereafter transpire.

Treaty fishermen are undeniably a unique class under well–established principles of federal law which this court is powerless to ignore. Treaty fishermen may, therefore, be treated as a distinct class of users for purposes of regulation without trammeling upon principles of equal protection. It cannot seriously be argued that the Director of the Department of Fisheries lacks power to allocate fish between distinct and competing user groups for purposes of conservation and systematic exploitation of the resource. Such allocation has been the principal effect of department regulation for many years. I would recognize the continuing power in the director to promulgate regulations for the purposes of conservation even though they have the effect of allocating fish between distinct user groups, including treaty fishermen, and would reverse the trial court.

# I
## INDIAN TREATY RIGHTS AND EQUAL PROTECTION

The majority opinion proceeds from the presumption that treaty and nontreaty fishermen possess identical rights to the state fishery and cannot lawfully be placed in separate categories for purposes of regulation. An examination of United States Supreme Court decisions interpreting the crucial clause of the Treaty of Medicine Creek and similar provisions in other treaties[5] establishes this is not the law. Native Americans who are beneficiaries of treaties negotiated by our government with their ancestors possess rights to the fish in our waters which clearly exceed those of ordinary citizens.

*United States v. Winans,* 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905), is the first of a long series of cases decided by the Supreme Court from this jurisdiction and concerns the scope of the rights conferred by the fishing provision at issue here. The issue presented in *Winans* was framed by the court as follows, at page 379:

> The pivot of the controversy is the construction of the second paragraph. Respondents contend that the words "the right of taking fish at all usual and accustomed places *in common* with the citizens of the Territory" confer only such rights as a white man would have under the conditions of ownership of the lands bordering on the river, and under the laws of the State, and, such being the rights conferred, the respondents further contend that they have the power to exclude the Indians from the river by reason of such ownership.

The principles enunciated by the court in answering this contention established the basic precepts which continue to control this area of law.

> The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon

---

[5]A typical provision reads:
"The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . ." Article 3, Treaty of Medicine Creek, 10 Stat. 1132, 1133 (1854).

the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted. . . . There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved "in common with citizens of the Territory." As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given "the right of taking fish at all usual and accustomed places," and the right "of erecting temporary buildings for curing them." The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, the Indians were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty.

*United States v. Winans, supra* at 381. The court then held that neither the State nor an abutting landowner could exclude the Indians from access to their usual and accustomed fishing grounds. The decision clearly established over 70 years ago that treaty Indians possess rights distinct from those of ordinary citizens.

The opinion in *Winans* recognized a principle of treaty interpretation which retains crucial importance in evaluating equal protection arguments raised with respect to treaty Indian rights. The rights and powers which Indian treaties establish are not *grants* of power *to* the Indians, but rather *surrender* of rights *from* them. Thus, rights not explicitly given up are rights *reserved* by the Indians. The importance of this principle in the current case results from its impact upon proper interpretation of the phrase, "in common with." In *Winans* the Supreme Court reversed a lower court decision limiting the Indians to only the same fishing

rights as others had. Using reserved rights analysis, Justice McKenna pointed to the absurdity of this interpretation; it was hardly reasonable to conclude that the Indians had been willing to give up all of their independent fishing rights in their entirety. In an oft–quoted passage, Justice McKenna discussed the decision of the lower court and evaluated it, at page 380:

> The remarks of the court clearly stated the issue and the grounds of decision. The contention of the respondents was sustained. In other words, it was decided that the Indians acquired no rights but what any inhabitant of the Territory or State would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more.

*Winans* stands unequivocally for the proposition that "in common with" does not limit Indian fishing rights to those which others may also exercise. Thus, the *Winans* decision is itself a clear recognition of the separate character *and separate source* of Indian treaty rights; while the ordinary United States citizen has rights as defined by the constitution and subject to limitation by the proper exercise of the police power of the states, treaty Indians *retain rights as established under treaty* prior to the grant of United States citizenship to the Indians.[6]

*Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), involved a challenge by a member of the

---

[6]Complementing the reserved rights analysis of *United States v. Winans,* 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905), are the principles of treaty construction mandating that (1) doubts and ambiguities are to be resolved in favor of the Indians, and (2) the treaties are to be construed as the Indians understood them. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 25 L. Ed. 2d 615, 90 S. Ct. 1328 (1970); *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973). These principles are so well established as to be beyond the necessity for comment, but they do underscore the propriety—indeed, the *necessity*—of recognizing that the treaties reserve to the Indians rights which others simply do not have. Because the source of Indian fishing rights is different from that of others, a distinction between the rights of these two groups with respect to the *scope* of those rights cannot run afoul of equal protection guaranties.

Yakima Tribe to his conviction for fishing without a state license. The court held:

> [W]hile the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here.
>
> In determining the scope of the reserved rights of hunting and fishing, we must not give the treaty the narrowest construction it will bear. In *United States v. Winans,* 198 U.S. 371, this Court held that, despite the phrase "in common with citizens of the Territory," Article III conferred upon the Yakimas continuing rights, beyond those which other citizens may enjoy, to fish at their "usual and accustomed places" in the ceded area; . . .

(Footnote omitted.) *Tulee v. Washington, supra* at 684.

The extent of the power of the State to regulate the treaty fishery for the conservation purposes recognized in *Tulee* was the next issue faced by the Supreme Court. In *Puyallup Tribe, Inc. v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968) (*Puyallup* I), the State sought an injunction against fresh water set net fishing by treaty Indians. The Supreme Court responded by reiterating *its prior* holdings to the effect that the State had power to regulate the off reservation treaty fishery where necessary for the conservation of fish, but pointed out that this standard is *"distinct from the federal constitutional standard concerning the scope of the police power of a State."* (Italics mine.) *Puyallup* I at 402 n.14. The court also dismissed the argument that the statutes granting citizenship to Indians altered or abrogated their preexisting treaty rights, stating: "The right to fish 'at all usual and accustomed' places *may,* of course, *not be qualified* by the State, *even though* all Indians born in the United States are now *citizens* of the United States." (Italics mine.) *Puyallup* I at 398. Thus, *Puyallup* I directly contradicts the assertions by the majority here that the Indians'

present status as citizens allows the equal protection clause to be utilized to abrogate established treaty rights.

*Puyallup* I was remanded for further findings on the conservation issue with the admonition that such findings "must cover the issue of equal protection implicit in the phrase 'in common with'". *Puyallup* I at 403. The majority mistakenly seizes upon this language as supportive of its position that treaty Indians have no greater rights than other citizens. Subsequent decisions of that court refute the majority's interpretation; it is now clear that the thrust of the court's equal protection concern is directed at securing full state respect for the rights of treaty fishermen.

Following the remand in *Puyallup* I, this court upheld fisheries regulations allowing a treaty net fishery for salmon and denying special rights to treaty fishermen as to steelhead. Both parties petitioned the Supreme Court for review and consolidated writs of certiorari were granted. *See Department of Game v. Puyallup Tribe, Inc.,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (*Puyallup* II). In its petition for writ of certiorari in *Puyallup* II, the State Department of Game listed as one of the grounds for Supreme Court review:

> The failure of the court, in the opinion below [*i.e.,* 80 Wn.2d 561] to hold that state conservation laws may be applied to Indian and non–Indian citizens on an equal basis in off–reservation waters violated the Equal Protection Clause adverted to by Justice Douglas in expressing the view for a unanimous court in the Puyallup opinion at 403.

Petition for Writ of Certiorari on behalf of the State of Washington Department of Game, United States Supreme Court cause No. 72–481, at 10. An examination of the briefs presented to the Supreme Court in that case confirms that the analysis embraced by the majority here was presented to the Supreme Court in *Puyallup* II.[7] Such an analysis

---

[7] A similar argument has also been considered and rejected by a majority of this court. *See Department of Game v. Puyallup Tribe, Inc.,* 80 Wn.2d 561, 497 P.2d 171 (1972). Indeed, Justice Hale in dissent castigated the majority for its rejection of the equal protection analysis which the State had urged upon this

was expressly rejected in *Puyallup* II. The issue presented was framed thusly by the court:

The ban on all net fishing in the Puyallup River for steelhead grants, in effect, the entire run to the sports fishermen. Whether that amounts to discrimination under the Treaty is the central question in these cases.

(Footnote omitted.) *Puyallup* II at 46–47. Though it was conceded that the Indians were free to pursue steelhead as sports fishermen, the court held the treaty granted to the treaty tribes special rights to a portion of the catch, over and above that enjoyed by others.

If hook–and–line fishermen now catch all the steelhead which can be caught within the limits needed for escapement, then that number must in some manner be *fairly apportioned* between Indian net fishing and non–Indian sports fishing . . .

The aim is to *accommodate* the *rights of Indians under the Treaty and the rights of other people.*

(Italics mine.) *Puyallup* II at 48–49. *Puyallup* II clearly establishes that Indians fishing pursuant to a treaty possess special rights and constitute a distinct class of fishermen. The conclusion that the type of equal protection argument advanced here by the majority was expressly rejected in *Puyallup* II is inescapable.[8]

---

court. Further, the majority opinion in that case made clear the court's recognition at that time of the distinct and separate status of treaty fishermen, a recognition which the majority's opinion in this case retracts without explicitly overruling, citing, or even acknowledging its prior analysis. It is particularly difficult to understand this court's current departure from its prior position, especially when that position was so clearly in harmony with the binding Supreme Court precedents, a distinction which the position of the majority in this case cannot enjoy.

[8]The statement in the majority opinion concerning the terms of the remand in *Puyallup* II is unfortunately inaccurate and therefore misleading. The majority asserts that *Puyallup* II was remanded with an admonition that the issue of equal protection is implicit in the term "in common with." The implication is that the majority's equal protection theory was recognized by the court in *Puyallup* II. *Puyallup* II was not, however, remanded with such an admonition. Such a statement only appears in the *Puyallup* II opinion in the introductory paragraphs explaining the holding in *Puyallup* I. The preceding comments show that this admonition was not intended to carry the meaning given it by the majority here.

*Puyallup* II also establishes that this special class of fishermen, in addition to other rights such as those enunciated in *Winans* and *Tulee,* is entitled to a fair portion of harvestable fish covered by the treaty and that what constitutes a "fair portion" is to be decided on a case–by–case basis on the facts presented.

> What formula should be employed is not for us to propose. There are many variables––the number of nets, the number of steelhead that can be caught with nets, the places where nets can be located, the length of the net season, the frequency during the season when nets may be used. On the other side are the number of hook–and–line licenses that are issuable, the limits of the catch of each sports fisherman, the duration of the season for sports fishing, and the like.

*Puyallup* II at 48–49.

Subsequent Supreme Court decisions reinforce this analysis. *Antoine v. Washington,* 420 U.S. 194, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975), concerned the scope of the treaty hunting rights of Colville Indians under a similar treaty provision. This court had upheld convictions for hunting out of season in violation of state law, rejecting a treaty defense. The Supreme Court reversed, again recognizing that Indian tribal members have special rights under their treaties.

> Finally, the opinion of the State Supreme Court construes Art. 6 as merely a promise by the United States that so long as it retained any ceded land and allowed others to hunt thereon, Indians would be allowed also to hunt there. 82 Wash. 2d, at 449–450, 511 P.2d, at 1357–1358. But the provisions of Art. 6 that the preserved rights are not exclusive and are to be enjoyed "in common with all other persons," does not support that interpretation or affect the Supremacy Clause's preclusion of qualifying state regulation. Non–Indians are, of course, not beneficiaries of the preserved rights, and the State remains wholly free to prohibit or regulate non–Indian hunting and fishing. The ratifying legislation must be

---

There not only is no statement in *Puyallup* II which supports the majority, rather the entire opinion refutes it.

construed to *exempt the Indians' preserved rights from like state regulation* . . .

(Italics mine.) *Antoine v. Washington, supra* at 205–06. Justice Douglas, in a concurring opinion, further clarified his opinions in *Puyallup* I and *Puyallup* II, stating:

> *It has long been settled* that a grant of rights—in the first case, fishing rights—on an equal footing with citizens of the United States would not be construed as a grant only of such rights as other inhabitants had. As stated in *United States v. Winans,* 198 U.S. 371, 380 (1905): "This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." That was our view in *Puyallup Tribe v. Department of Game,* 391 U.S. 392 (1968). A "right" which the Federal Government grants an Indian may "not be qualified or conditioned by the State," *id.,* at 399.
>
> I agree with the Court that conservation measures, applicable to all, are available to the State, *id.,* at 398–403; but *discrimination against the Indians* by conservation measures is not permissible, *Washington Game Dept. v. Puyallup Tribe,* 414 U.S. 44, 48 (1973). . . . The State boldly claims that its power to exact a hunting license from all hunters qualifies even the Indians' right to hunt granted by Congress, irrespective of any conservation need. A State may do that when it comes to non–Indians or to Indians with no federal hunting rights, *Lacoste v. Department of Conservation,* 263 U.S. 545, 549 (1924). *But Indians with federal hunting "rights" are quite different.*

(Italics mine.) *Antoine v. Washington, supra* at 211–12. Thus, after *Antoine* there could be no doubt that (1) the phrase "in common with" is *not* to be construed as merely giving the treaty Indians the same rights that others had, as the majority's fallacious analysis does; and (2) Indians possessing rights under treaties constitute a special and separate class for constitutional purposes.

One year after *Antoine* the United States Supreme Court denied certiorari in *United States v. Washington, supra.* The opinion of the Ninth Circuit in that case, which affirmed the District Court, rests squarely upon the "fair

portion" holding of *Puyallup* II. *See United States v. Washington,* 520 F.2d 676, 687–88 (9th Cir. 1975). The Ninth Circuit recognized the treaty Indians' right to an equitable apportionment of the harvestable fish, which was mandated by *Puyallup* II, and held the apportionment ordered by the District Court was within the trial judge's discretion as a court of equity devising an apportionment. This is entirely consistent with the Supreme Court 's holding in *Puyallup* II and adds nothing new to it. The Ninth Circuit specifically did not rest its decision upon the necessity of a precise 50 percent apportionment of fish to the treaty tribes. It held the District Court had applied the appropriate legal principles (*i.e.,* the necessity for an equitable apportionment) and reviewed the precise allocation made only for abuse of discretion. The Supreme Court predictably denied certiorari in this case because it presented no questions which the court had not passed upon in *Puyallup* II.

The Supreme Court's most recent pronouncements in this field are contained in *Puyallup* III, which arose as a result of the remand in *Puyallup* II and subsequent decision of this court in the same case. *See Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976). In its opinion following remand this court upheld an allocation of 45 percent of the natural run of steelhead to Indian fishermen. In an expansive bit of dicta the majority invited the Supreme Court to reconsider its interpretation of the treaty provision. The State, in its petition for writ of certiorari, presented once again to the Supreme Court essentially the same argument which the majority here has submitted to be unique, and indeed recognized that this issue had been previously decided. In his petition the Attorney General stated:

We recognize that the Court [*i.e.,* the United States Supreme Court] has ruled upon this issue in Puyallup II 414 U.S. 44 . . .

Response to Petition for Certiorari and Cross Petition by State of Washington Department of Game, Supreme Court

cause No. 76–423, at 24. It can hardly be said that the equal protection argument advanced in this case is new or unique. The Supreme Court affirmed the 45 percent allocation in *Puyallup* III.

To summarize, the federal cases establish that treaty Indians enjoy a specific federal right, or occupy a special class, *entitled to take fish at specific locations*. In part this is a property right, including an easement across even privately owned adjacent land to gain access to a reserved fishing site. *United States v. Winans, supra*. The exemption from taxation established in *Tulee v. Washington, supra,* is yet another aspect of this right, being an immunity which even the fee owner of riparian property may not assert. But these attributes do not exhaust the scope of the treaty clause. The treaty also provides protection from state regulation which effectively and unnecessarily destroys the right to take fish set forth by the treaty provision. In order to regulate the treaty fishery the State must show that its regulation is a reasonable and necessary conservation measure *and* that its application to the Indians is necessary in the interests of conservation. *Tulee v. Washington, supra; Department of Game v. Puyallup Tribe, Inc., supra* (*Puyallup* II); *Antoine v. Washington, supra.* Finally, the State must also "fairly apportion" the harvestable run of fish remaining available after such regulation between treaty fishermen and others. *See Puyallup* II; *United States v. Washington, supra.*

When these special rights are contrasted with those of ordinary citizens it is apparent that federal law has established that two distinct classes of fishermen exist in the state of Washington. It is settled law that the State is free to enact regulations prescribing the terms upon which private citizens may take possession of fish found in this state's waters because those fish are the property of the sovereign. *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 502 P.2d 1170 (1972), *cert. denied,* 411 U.S. 982 (1973); *State v. Moses,* 79 Wn.2d 104, 483 P.2d 832 (1971), *cert. denied,* 406 U.S. 910 (1972); *Vail v. Seaborg,* 120 Wash.

126, 207 P. 15 (1922). State regulations may not, however, be applied to treaty fishermen in a manner which conflicts with their aforementioned rights under federal treaties. Indian treaties have the same force and effect as treaties with foreign nations. As such, they are a part of the supreme law of the land and are binding upon the states, state laws to the contrary notwithstanding. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L. Ed. 25 (1831). The fact that Indians have since been made citizens of the United States in no way impairs the continued validity of their treaty rights or the obligation of the states to respect them. *See Puyallup* I.

The majority contends the Department of Fisheries may not enact regulations for purposes of conservation which result in an allocation of fish between treaty and nontreaty fishermen because to do so would result in a discriminatory allocation of fish between members of the same class. The opinion rests upon a false premise. As has been clearly demonstrated, treaty and nontreaty fishermen are in fact members of different classes and may be treated differently without violating the precepts of equal protection.

> Article I, § 12 of the state constitution and the fourteenth amendment to the Federal constitution, prohibiting special privileges and immunities and guaranteeing equal protection of the laws, require that *class legislation must apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within, and those without, a designated class.* Within the limits of these restrictive rules, the legislature has a wide measure of discretion, and its determination, when expressed in statutory enactment, cannot be successfully attacked unless it is manifestly arbitrary, unreasonable, inequitable, and unjust.

*Washington Kelpers Ass'n v. State, supra* at 421, quoting *Clark v. Dwyer,* 56 Wn.2d 425, 435–36, 353 P.2d 941 (1960). Contrary to the assertion in *Puget Sound Gillnetters Ass'n v. Moos,* 88 Wn.2d 677, 565 P.2d 1151 (1977), the proposed

regulations do not result in classification on the basis of race, but upon rights under *federal treaties.* Many native Americans do not possess the special treaty rights which the federal courts have ordered this State to respect. Treaty Indians possess vested rights which set them apart from ordinary citizens and establish them as a distinguishable class for purposes of state regulation. There is no violation of equal protection here.

## II
### THE SCOPE OF THE DIRECTOR'S REGULATORY POWERS

The Director of Fisheries' regulatory powers are set forth principally in three statutes, RCW 75.08.012; .020; .080. These statutes are clearly designed to allow the director to enact regulations to conserve the state fishery in order to preserve and enhance the industry's economic viability. The director's duties in this regard are set forth in mandatory terms in RCW 75.08.012.

> It shall be the duty and purpose of the department of fisheries to preserve, protect, perpetuate and manage the food fish and shellfish in the waters of the state and the offshore waters thereof to the end that such food fish and shellfish shall not be taken, possessed, sold or disposed of at such times and in such manner as will impair the supply thereof. For the purpose of conservation, and in a manner consistent therewith, the department shall seek to maintain the economic well–being and stability of the commercial fishing industry in the state of Washington.

The more specific provisions of RCW 75.08.020 and .080[9] are consistent with this general mandate. In order to effectively exercise the mandatory duties imposed upon him by

---

[9] "The director shall devote his time to the duties of his office and enforce the laws and regulations of the director relating to propagation, protection, conservation, preservation, and management of food fish and shellfish." RCW 75.08.020.

"The director shall investigate the habits, supply and economic use of, and classify, the food fish and shellfish in the waters of the state and the offshore waters, and from time to time, make, adopt, amend, and promulgate rules and regulations as follows:

"(1) Specifying the times when the taking of any or all the various classes of food fish and shellfish is lawful or prohibited.

statute, it is essential that this court recognize the power of the director to enact regulations which he finds necessary to preserve and promote the fisheries resource in light of the new demands placed upon it by virtue of federal court decisions which are binding upon the state. As pointed out by Justice Horowitz in his dissent in *Puget Sound Gillnetters Ass'n v. Moos*, 88 Wn.2d 677, 693–94, 565 P.2d 1151 (1977):

> *United States v. Washington, supra* at 389–93, 399–412, 413–20, and particularly at page 416, held that the Department of Fisheries and its director had the authority and were indeed obligated under the supremacy clause to refrain from violating the District Court injunction. Indeed, the defendants, including the Department of Fisheries and its director, are specifically ordered to "fully observe and to the best of their ability carry out the provisions and purposes of the treaties cited in paragraph 1 of the Findings of Fact," and "conform their regulatory action and enforcement to each and all of the standards set forth in Final Decision #1." *United States v. Washington, supra* at 414. This provision is now final in the federal court system and the Department of Fisheries and its director are bound by the injunction. Moreover, as *United States v. Washington, supra* at 402 states: "Because the right of each treaty tribe to take anadromous fish arises from a treaty with the United States, that right is reserved and protected under the supreme law of the land, does not depend on state law, is

"(2) Specifying and defining the areas, places, and waters in which the taking and possession of the various classes of food fish and shellfish is lawful or prohibited.

"(3) Specifying and defining the types and sizes of gear, appliances, or other means that may be lawfully used in taking the various classes of food fish and shellfish, and specifying the times, places, and manner in which it shall be lawful to possess or use the same.

". . .

"(6) The fixing of the size, sex, numbers, and amounts of the various classes of food fish and shellfish that may be taken, possessed, sold, or disposed of.

"(7) Regulating the landing of the various classes of food fish and shellfish or parts thereof within the state.

". . .

"(12) Promulgating such other rules and regulations as may be necessary to carry out the provisions of this title and the purposes and duties of the department." RCW 75.08.080.

distinct from rights or privileges held by others, and may not be qualified by any actions of the state."

To fail to recognize this binding ruling at this point will only further imperil the resource itself and insure that the State will lose a substantial amount of control over this vital resource to the federal government and those agencies which ultimately are vested with control of the treaty fishery. Such a result is certainly counterproductive. The refusal of our state courts to accept as binding the pronouncements of federal courts with regard to the federal rights of treaty fishermen has already contributed to a substantial loss of state control over the state fisheries resource. The federal government has now entirely preempted the power of the states to manage the offshore fishery beyond the territorial limits of the state. *See Northwest Trollers Ass'n v. Moos*, 89 Wn.2d 1, 568 P.2d 793 (1977). Federal enforcement officers also patrol our inland waters, utilizing the federal contempt power to enforce federal rights which our state courts have chosen in many instances to ignore. The state fisheries director has himself been placed in personal jeopardy by the federal court for alleged refusal to comply with its orders. The state fisheries resource has suffered considerably from the absence of a consistent comprehensive management policy throughout this lengthy legal entanglement. More importantly, this controversy has escalated to the point at which the lives and property of individual citizens are in peril. It would be painfully naive to assert that this court's reluctance to recognize the validity of the decisions of the United States Supreme Court and other federal courts with regard to the treaty fishery is not at least in part responsible for this situation.

In *Gillnetters* the majority recognized that the director possesses the power to allocate fish between competing claimants for the purpose of conservation. *Puget Sound Gillnetters Ass'n v. Moos, supra* at 683. It held, however, that this power did not include authority to allocate fish between competing claimants of the *same class*. As the

previous discussion shows, treaty and nontreaty fishermen are not "of the same class" and the *Gillnetters* decision is therefore not controlling.

*Gillnetters* also mistakenly rests upon the proposition that the United States Supreme Court has not construed the treaty provision in a manner which is binding upon the State. This is also incorrect. *Puyallup* II expressly holds that the treaty clause entitles its beneficiaries to take a fair portion of the harvestable fish. The subsequent decision in *United States v. Washington, supra,* is expressly based upon the controlling rule of law enunciated in *Puyallup* II. This court is, of course, *not* free to interpret the treaty clause in a manner inconsistent with *Puyallup* II. The allocation ordered against the State by the District Court in *United States v. Washington, supra,* has been held to be within the trial court's discretion under the fair portion rule by the Ninth Circuit and the Supreme Court has denied certiorari, making that judgment final and binding upon the State as a party to that action.

Given all this, the simple fact is that, if the director is not allowed to promulgate regulations for the conservation of the fishery which reflect the competing rights of treaty and nontreaty fishermen, someone else will. The regulations promulgated by the department under these statutes have for many years resulted in allocation of fish between competing classes of user groups such as commercial and non-commercial, seiners and gillnetters, etc. A new class now exists which it is both logical and necessary that the director take into account. To hold that he is without power to do so is both inconsistent with established law and will but assure that the legislative purpose set forth in RCW 75.08-.012 will be entirely frustrated.

The words "conservation" and "management" in the applicable statutes are broad enough to encompass the principles of allocation embodied in the challenged regulations. Allocation is an important factor in the conservation of fish runs. Where a resource is not presently plentiful enough to satisfy all needs, a restriction on

withdrawal must be instituted in order to conserve the renewable resource and insure its availability in the future.

*Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 87 Wn.2d 417, 423–24, 553 P.2d 113 (1976) (Utter, J., dissenting).

The majority opinion misconstrues cases and ignores binding precedent. It reaches a result which can only make a poor situation much worse for all citizens of our state. I dissent.

HOROWITZ, J., concurs with UTTER, J.