813 F.2d 1020
 UNITED STATES of America, et al., Plaintiffs,
and
Quinault Indian Tribe, et al., Plaintiffs-Intervenors-Appellees-
Cross-Appellants,
v.
STATE OF WASHINGTON, Defendant-Appellant-Cross-Appellees.
 Nos. 85-3908, 85-4009.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 8, 1986.
Withdrawn from Submission Aug. 22, 1986.
Resubmitted Sept. 15, 1986.
Decided March 31, 1987.
 
 Kenneth O. Eikenberry and David E. Walsh, Olympia, Wash. for defendants-appellants-cross-appellees.
 Steven S. Anderson and Phillip E. Katzen, Seattle, Wash. for plaintiffs-appellees-cross-appellants.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT and ANDERSON, Circuit Judges, and LYNCH,* District judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 The State of Washington appeals from the district court's order awarding attorneys' fees and costs pursuant to 42 U.S.C. Sec. 1988 to appellee Indian tribes ("the Tribes") for participation in United States v. Washington.[1] We reverse.
 
 BACKGROUND
 
 2
 The factual background of this appeal is set out more fully in Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). In brief, this case began in 1970. The issues concerned the character of the right to take fish under several Indian treaties entered into by the United States and various tribes in 1854 and 1855.[2] The Indians, in return for their relinquishing their interest in certain lands in what is now the State of Washington, were given, among other things, the "right of taking fish at usual and accustomed grounds and stations ... in common with all citizens of the Territory." 10 Stat. 1133.
 
 
 3
 The litigation began in a suit by the United States, which sued on its own behalf and on behalf of several Indian tribes, against the State of Washington seeking an interpretation of the treaties and an injunction requiring the State to protect the Indians' share of anadromous fish runs. The district court, in 1974, held that the Indians were entitled to a 45 to 50% share of the harvestable fish that would at some point pass through recognized tribal fishing grounds in a defined area, to be calculated on a river-by-river, run-by-run basis, subject to certain adjustments.[3] The Ninth Circuit affirmed with slight modification,[4] and the United States Supreme Court denied certiorari.[5]
 
 
 4
 Pursuant to an injunction issued by the district court, the Fisheries Department of Washington adopted regulations protecting the Indians' treaty rights. These regulations were challenged by private citizens in suits filed in Washington State courts. The Washington Supreme Court ultimately held that the Fisheries Department could not comply with the federal injunction, holding, among other things, that the treaties did not give the Indians a right to a share of the fish runs.[6] The district court then entered a series of orders enabling it, directly, with the help of the Washington United States Attorney, to supervise those aspects of the State's fisheries necessary to the preservation of the treaty fishing rights.[7] The Ninth Circuit affirmed,[8] but the United States Supreme Court vacated the judgments of the Ninth Circuit, the district court, and the Washington Supreme Court.[9] The United States Supreme Court held, in pertinent part, that (1) the Indian treaties secured a right to harvest a share of each run of anadromous fish that pass through tribal fishing areas; (2) the harvestable portion of each run should be divided equally into treaty and nontreaty shares and then the treaty share should be reduced if tribal needs could be satisfied with a lesser amount, and (3) the state law prohibition against complying with the district court decree could not survive the Supremacy Clause.
 
 
 5
 Shortly after the 1974 decision and injunctions were entered, the Tribes' attorneys moved for an award of attorneys' fees pursuant to the private attorney general, bad faith, and the common fund theories. The district court, in September 1974, found that an award would be appropriate under the private attorney general theory, but held that the award was barred by the Eleventh Amendment. While the Tribes' appeal was pending, the United States Supreme Court decided Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which eliminated the private attorney general theory as a basis for a fee award. The Ninth Circuit then dismissed the appeal and remanded the proceeding "to the district court for a determination in light of Alyeska...." (ER p. 19).
 
 
 6
 Before the case was resubmitted, Congress enacted the Civil Rights Attorneys' Fees Award Act, 42 U.S.C. Sec. 1988, which reinstated the private attorney general theory in actions brought under the Civil Rights statutes. No further action regarding the attorneys' fee issue was taken until October 30, 1980 when the Tribes' attorneys filed a renewed motion for an award of attorneys' fees.
 
 
 7
 In May 1981, the district court ruled that the Tribes had alleged and prevailed upon a cause of action under 42 U.S.C. Sec. 1983 and were therefore entitled to attorneys' fees under Sec. 1988. The court found that the case was pending when Sec. 1988 was enacted, that the original application for attorneys' fees was timely filed and remained pending for a decision, that the Eleventh Amendment did not bar recovery for attorneys' fees, and that the Tribes were entitled to an award of attorneys' fees for services rendered in all proceedings within the framework of the case, including appeals. The court then referred the determination of the specific amount of the award to Magistrate John Weinberg.
 
 
 8
 In his Report and Recommendation, Magistrate Weinberg determined that the Tribal attorneys did exceptionally well in providing documentation for the hours claimed, that all of the hours were reasonably expended, and recommended an award for time claimed in 57 of the 59 proceedings for which the Tribes sought compensation. In calculating the "Lodestar" amount, he recommended that the award should be calculated using an adjusted hourly rate based on prevailing historic rates, adjusted for inflation. In addition, the magistrate recommended no adjustment be made for lost use of money and that no multiplier be awarded. The magistrate's proposed fee award was $2,316,949.96.
 
 
 9
 The district court adopted the magistrate's recommendations with two exceptions. The court increased the adjustment to the historic hourly rate to reflect both inflation and loss of opportunity. The court also compensated the claimed travel time at 100% of the hourly rate rather than 50% as recommended by the magistrate. The final award ordered by the district court was in the amount of $2,948,770.76. This appeal followed.[10]
 
 DISCUSSION
 A.
 
 10
 The dispositive question in this appeal is whether the Tribes have stated a claim under 42 U.S.C. Sec. 1983[11] for which attorneys' fees are available under 42 U.S.C. Sec. 1988.[12] This is answered by examining the character of the principal question that came before the Supreme Court in Fishing Vessel.
 
 
 11
 There is no doubt that the Supreme Court considered the principal question to be the "character of th[e] treaty right to take fish." Fishing Vessel, 443 U.S. at 662, 99 S.Ct. at 3062 (emphasis added). Indeed, the Supreme Court noted that the litigation commenced when the United States brought suit against Washington seeking an "interpretation of the treaties " and an injunction. Id. at 670, 99 S.Ct. at 3066 (emphasis added). After discussing the anadromous fisheries and the treaty negotiations, the Court stated that "[u]nfortunately, that resource [fish] has now become scarce, and the meaning of the Indians' treaty right to take fish has accordingly become critical." Id. at 669, 99 S.Ct. at 3066 (emphasis added). In a footnote, the Court stated that "[d]espite our earlier denial of certiorari on the treaty interpretation issue, we decline the Government's invitation to treat the matter as having been finally adjudicated...." Id. at 672 n. 19, 99 S.Ct. at 3067 n. 19 (emphasis added).
 
 
 12
 Two of the parties' four original interpretations of the key treaty language were submitted to the Supreme Court. The State of Washington adopted the view that it is merely access to the fishing sites that the treaties secured. The Tribes took the position that they have a right to take whatever quantity they need. Id. at 675, 99 S.Ct. at 3069. The Court used contract law to interpret the treaties since "[a] treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." Id. The Court looked to the intent of the parties, as well as previous case law, when it concluded:
 
 
 13
 The purport of our cases is clear. Non-treaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of anadromous fish in the case area. Nor may treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other "citizens of the Territory." Both sides have a right, secured by treaty, to take a fair share of the available fish. That, we think, is what the parties to the treaty intended when they secured to the Indians the right of taking fish in common with other citizens.
 
 
 14
 Id. at 684, 99 S.Ct. at 3074.
 
 
 15
 It is apparent that throughout the opinion the Supreme Court was making a determination of what exact rights each party had to the fish. As the Court stated, it granted certiorari "to interpret this important treaty provision." Id. at 674, 99 S.Ct. at 3068. There was no discussion of the state violating the Indians' rights under the treaty or under the Fourteenth Amendment. It is not disputed that the Indians had rights under the treaty. Just exactly what those rights were was unknown until the Supreme Court decision. If the State of Washington violates these now known and well-delineated rights, there would be an actual conflict between state and federal law which might give rise to a Sec. 1983 action. See White Mountain Apache Tribe v. Williams, 798 F.2d 1205 (9th Cir.1985), as amended by 810 F.2d 844, 850 n. 8 (9th Cir.1987), cert. denied sub nom. White Mountain Apache Tribe v. Arizona State Transp. Bd., --- U.S. ----, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). That, however, has not yet happened and is not the situation here.
 
 
 16
 We therefore hold that the Tribes' treaty interpretation claims do not give rise to a claim cognizable under Sec. 1983. Accordingly, we conclude that such claims do not support an award of attorneys' fees under Sec. 1988.B.
 
 
 17
 Nor are the Tribes entitled to fees on the basis of pendent Fourteenth Amendment claims pleaded in their original federal complaint. We hold that the Fourteenth Amendment claims do not meet the substantiality test of Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The Hagans substantiality test requires a plaintiff to allege constitutional violations sufficiently substantial to support federal jurisdiction. Maher v. Gagne, 448 U.S. 122, 130-31, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). In the case at hand, the district court found jurisdiction on four grounds: 28 U.S.C. Secs. 1345, 1331, 1343(3) and (4), and 1362. Although Sec. 1345 alone establishes jurisdiction,[13] we hold that any Fourteenth Amendment claims lurking about were "so attenuated and unsubstantial as to be absolutely devoid of merit." Hagans, 415 U.S. at 537, 94 S.Ct. at 1379 (citations omitted).
 
 
 18
 Although the district court made mention of "equal protection" and "due process," it was mainly in the sense regarding future state regulations. The district court did find, however, that the present state regulations did discriminate against the Indians, but only in the sense that the state failed to recognize the special entitlement the Indians were to be given. The district court did not hold that the state discriminated for the sake of discrimination--the discrimination was due to the failure to recognize the Indians' special status. Both sides appealed to the Ninth Circuit. In our opinion, the Ninth Circuit characterized the relationship between Indians and non-Indians as a cotenancy, discussed the state regulations which it noted appeared sound and commendable, and stated that in treating treaty Indians no differently than other citizens, the state rendered the treaty guarantees nugatory. United States v. Washington, 520 F.2d at 685-86. Nowhere did the court hold that the state had violated any Fourteenth Amendment rights. In our second opinion on this matter, we discussed the only equal protection argument presented to it--that treating Indians differently from non-Indians in allocating and regulating fish violated basic equal protection principles. The court noted that equal protection is an issue only as it limits the state's regulation of Indian fishing in those areas where the state has a right to regulate. Puget Sound Gillnetters Ass'n v. U.S. Dist. Court, 573 F.2d at 1127-28. When the Supreme Court wrote its opinion, equal protection was never mentioned. It appears then that the Indians abandoned their equal protection arguments after the initial complaints and initial district court decision. See White Mountain, 798 F.2d at 1215.
 
 
 19
 We conclude that the Fourteenth Amendment claims fail to meet the substantiality test of Hagans v. Lavine and have been asserted in this action "solely for the purpose of obtaining fees in [an action] where 'civil rights' of any kind are at best an afterthought." Maine v. Thiboutot, 448 U.S. 1, 24, 100 S.Ct. 2502, 2514, 65 L.Ed.2d 555 (1980) (Powell, J., dissenting).
 
 CONCLUSION
 
 20
 The underlying issue in this appeal is whether the Tribes stated a claim under Sec. 1983. We hold that they did not. This case deals not with civil or Fourteenth Amendment rights, but with the interpretation of a treaty--a struggle among sovereigns for the "right of taking fish...." 10 Stat. 1133. We therefore reverse the district court's order awarding attorneys' fees.
 
 
 21
 JUDGMENT REVERSED.
 
 
 
 *
 Honorable Eugene F. Lynch, United States District Judge, Northern District of California, sitting by designation
 
 
 [1]
 United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97, rehearing denied, 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976); 459 F.Supp. 1020 (W.D.Wash.1978), aff'd sub nom. Puget Sound Gilnetters Ass'n v. U.S. District Court for the Western District of Washington, 573 F.2d 1123 (9th Cir.1978), aff'd in part, vacated in part, and remanded sub nom. Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, modified, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979)
 
 
 [2]
 Treaty of Medicine Creek (10 Stat. 1132); Treaty of Point Elliott (12 Stat. 927); Treaty of Point No Point (12 Stat. 933); Treaty of Neah Bay (12 Stat. 939); Treaty with the Yakamas (12 Stat. 951); and Treaty of Olympia (12 Stat. 971)
 
 
 [3]
 384 F.Supp. 312 (W.D.Wash.1974)
 
 
 [4]
 520 F.2d 676 (9th Cir.1975)
 
 
 [5]
 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) ("Fishing Vessel ")
 
 
 [6]
 Puget Sound Gillnetters Ass'ns v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977); Fishing Vessel Ass'n v. Tollefson, 89 Wash.2d 276, 571 P.2d 1373 (1977)
 
 
 [7]
 459 F.Supp. 1020 (W.D.Wash.1978)
 
 
 [8]
 573 F.2d 1123 (9th Cir.1978)
 
 
 [9]
 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)
 
 
 [10]
 Because we reverse the district court's order granting attorneys' fees, we do not reach the merits of the other issues raised in this appeal
 
 
 [11]
 42 U.S.C. Sec. 1983 states:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [12]
 42 U.S.C. Sec. 1988, the Civil Rights Attorney's Fees Award Act of 1976, provides:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 [13]
 28 U.S.C. Sec. 1345 (1976) provides:
 Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.