[No. 43750.    En Banc.    April 8, 1976.]

MICHAEL E. LINDSAY, ET AL, *Plaintiffs*, WESLEY BRABANT, *Appellant*, v. THE CITY OF SEATTLE, ET AL, *Respondents*.

*C. R. Lonergan, Jr.* (of *Siderius, Lonergan & Crowley*), for appellant.

*John P. Harris, Corporation Counsel,* and *Gordon F. Crandall, Assistant,* for respondents City of Seattle, et al.

*James E. Fearn, Jr.,* and *Peter Greenfield* of *Legal Services Center* (Seattle), for respondents Green, et al.

This opinion was prepared by the late Justice Robert C. Finley. It is adopted by the undersigned Justices as the opinion of this Court.

The central issue raised in this case is whether the City of Seattle may adopt a system or program for the employment of civil service workers that gives special employ-

ment preference or priority as to jobs to certain qualified individuals solely because they are members of minority groups.

Wesley Brabant, a civil service employee with the City of Seattle, was passed over for possible promotion to a foreman's position in the engineering department. Instead, Emeliano Ponce, a Spanish surnamed minority eligible, was chosen to fill the vacancy to further the goals of the City's "affirmative action program," which was designed to correct preexisting discrimination and to equalize employment opportunities in the City's civil service. Brabant brought suit against the City, alleging his entitlement to promotion to the position which had been given to Emeliano Ponce. The trial court granted defendant's motion for a summary judgment and Brabant has appealed.

Brabant contends the trial court erred in denying him relief because: (1) selective certification under rule 7.03 (j), Seattle Civil Service Laws and Rules, violates the express provisions of article 16, section 9, of the city charter; (2) the selective certification violates the fourteenth amendment to the United States Constitution and Const. art. 1, § 3; (3) the commission lacks the authority to delegate to its secretary the discretionary power to certify eligible candidates for appointment; and (4) the City's affirmative action program goes beyond existing federal or state requirements. We disagree and affirm the trial court.

. The parties have agreed and stipulated as to the facts, which we recap as follows: On August 25, 1972, the Mayor of Seattle issued an executive order establishing an *affirmative action program*. The goal of the program was "to increase the number of underrepresented persons employed by the City to correspond with their statistical composition within the available working force of the population" of Seattle. The City passed an ordinance, approved by the Mayor on October 27, 1972, that provided for implementation of the affirmative action program "to achieve equality of City employment opportunities for members of minority races." Under the ordinance, all city departments

were required to establish and maintain effective affirmative action programs until the effects of inequality of employment opportunities were eliminated. The Seattle engineering department, on June 21, 1972, promulgated a departmental policy statement that established as the goal of that department the achievement of ratios of minority employment "comparable to the ratios of . . . minorities in the Seattle Community." The department adopted as an emergency measure during the years 1972-74 a rule that "the first of every three vacancies resulting from retirement or termination in under-represented classes will be filled with appropriate minorities."

Article 16, section 9, of the Seattle City Charter established the method by which the Civil Service Commission shall certify available eligible candidates to a department head for possible employment by the City. Specifically, it provides that, if the head of a department notifies the commission of a vacancy in an office classified under article 16, the commission is required to certify to the appointing authority the top five eligible candidates who have successfully passed the civil service examination and are available. In the alternative, the commission is required to certify the top 25 percent of the available and eligible candidates on the register if that number is more than the top five.

As a result of the emphasis placed on affirmative action in public employment and the City's awareness that its employee selection procedures had discriminated against minorities, the commission adopted a special certification procedure to further the goals of affirmative action. Rule 7.03(j) allows selective certification of "only the highest ranking eligibles" of a particular minority when necessary to implement the affirmative action program. A selective certification of a minority eligible must be requested by the department head, approved by the secretary of the commission, and by the director of the City's Department of Human Rights.

The plaintiff, Brabant, a nonminority eligible, took the City's civil service examination for the position of signal

electrician foreman in 1969 and was placed on the promotional register of eligibles fourth from the top with a grade of 88.58. In 1970, Brabant was appointed to an intermittent vacancy in the engineering department to serve as relief foreman when a regular foreman was on vacation or sick leave.

Emeliano Ponce, a minority applicant, also took and passed the promotional examination in 1969 and was placed on the register of eligibles eighth from the top with a grade of 81.83. In 1972, he also was appointed to an intermittent vacancy in the engineering department to serve as a relief foreman.

On January 31, 1973, the engineering department requested a selective certification to fill a vacancy of signal electrician foreman. The request for selective certification was approved, and Ponce, who was not among the top five on the eligible register at the time, was appointed by the engineering department to fill the vacancy on March 1, 1973.

The City is an "employer" under title 7 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and is subject to its provisions. Section 2000e-2(a)(2) of the act provides that it is an unlawful employment practice for an employer to

> limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Section 2000e-5(g) authorizes courts to "order such affirmative action as may be appropriate" to remedy the effects of unlawful employment practices. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974).

Congress enacted title 7 of the Civil Rights Act of 1964

> to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin.

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-430 (1971). Cooperation and voluntary compliance were selected as the preferred means for achieving this goal.

*Alexander v. Gardner-Denver Co., supra* at 44. *Accord, Associated Gen. Contractors of Mass., Inc. v. Altshuler*, 490 F.2d 9, 15 (1st Cir. 1973), *cert. denied*, 416 U.S. 957, 40 L. Ed. 2d 307, 94 S. Ct. 1971 (1974).

The City voluntarily has established a program of affirmative relief and, in an effort to comply with title 7, has chosen selective certification of qualified minority applicants as the most efficacious means to eradicate the effects of past discriminatory practices in its employee selection procedure.

That the City's selection processes through the civil service examinations administered in the past have discriminated against minority applicants is borne out by the record and statistical information.

By affidavit dated September 7, 1973, Thomas F. Hanley, secretary of the Civil Service Commission, stated that the Equal Employment Opportunity Commission has formally charged the City with unlawful employment practices in violation of title 7 of the 1964 Civil Rights Act, arising in part because it " 'administers unvalidated tests which have the effect of eliminating a disproportionate number' " of minority persons. The formal charge attached to the Hanley affidavit also indicates that the City has maintained a seniority system which operates to perpetuate the effects of past discriminatory practices and procedures. The affidavit further indicates that it will take the City several years to validate all examinations given for positions by the City's civil service department, *i.e.*, to determine whether the examinations are designed to measure reliably an individual's ability or capacity to perform a particular job.

On October 20, 1971, the Civil Service Commission, in conjunction with rule 7.03(j), Seattle Civil Service Laws and Rules, adopted a resolution that the

civil service tests have had the effect, in some cases, of

discriminating against minority applicants among those deemed eligible for appointment . . . [and that the] results [of the examinations] tend to cause the minority applicants to be placed at the lower end of the eligible registers and therefore have little or no chance of being employed.

The parties stipulated to the factual assertions stated in the Civil Service Commission's resolution.

By affidavit dated June 28, 1973, Philip Hayasaka, the City's director of the Department of Human Rights, stated that in 1969 the City had 10,294 employees, 780 or 7.6 percent of whom were members of minority races. The 1970 census, according to the affidavit, indicated that of the 530,831 persons living in the city, 77,796 or 14.7 percent were minorities. The affiant stated that the following statistics (compiled by the department in 1972) were considered by the Department of Human Rights prior to its approval of the use of selective certification in the instant case: (1) of the three signal electrician foremen in the engineering department, no one was of a minority; (2) of the 50 foremen in the engineering department, 3 or 6 percent were minorities; (3) of the 136 unskilled laborers in the engineering department, 50 or 36.7 percent were minorities; and (4) of the 10,630 persons employed by the City, 1,359 or 12.7 percent were minorities.

◼ The statistical information in the record indicates that the employee selection procedures used by the City had, over a period of years, created a substantially disproportionate level of minority representation in public employment. The statistical evidence raises an inference that the racial imbalance is a result of discriminatory examinations and practices. A prima facie case of discrimination based on such evidence is established. *Rogers v. International Paper Co.*, 510 F.2d 1340, 1348 (8th Cir. 1975); *United States v. Masonry Contractors Ass'n*, 497 F.2d 871, 875 (6th Cir. 1974); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 55 (5th Cir. 1974); *Carter v. Gallagher*, 452 F.2d 315, 323 (8th Cir. 1971), *modified on rehearing en*

*banc,* 452 F.2d 327 (8th Cir.), *cert. denied,* 406 U.S. 950, 32 L. Ed. 2d 338, 92 S. Ct. 2045 (1972).

The test of the validity of employee selection procedures under title 7 is comparable to the test of their validity over the long run under the Fourteenth Amendment. *United States v. Chesterfield County School Dist.,* 484 F.2d 70, 73 (4th Cir. 1973); *see Castro v. Beecher,* 459 F.2d 725, 733 (1st Cir. 1972). The test statutorily is defined in 42 U.S.C. § 2000e-2(a)(2) which proscribes classification of employees "in any way which would deprive or. tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . or national origin." Thus, in the past, the City's prior discriminatory examinations and employee selection procedures have violated the constitutional rights of minority applicants. When state or local officials have deprived a class of individuals of their rights guaranteed by the equal protection clause of the Fourteenth Amendment, the federal courts have

> not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.

*Louisiana v. United States,* 380 U.S. 145, 154, 13 L. Ed. 2d 709, 85 S. Ct. 817 (1965); *accord, NAACP v. Allen,* 493 F.2d 614, 617 (5th Cir. 1974); *Carter v. Gallagher, supra* at 328.
■ In *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971), the United States Supreme Court stated:

> Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

The effects of past discrimination tend to perpetuate themselves because the resulting inequalities make new employment opportunities less accessible to minorities. *Associated Gen. Contractors of Mass., Inc. v. Altshuler, supra* at 16; *see DeFunis v. Odegaard,* 82 Wn.2d 11, 36, 507 P.2d 1169

(1973). Under title 7, the obligation not to discriminate does not allow indifference to employment procedures outwardly neutral but racially oriented. Opinion of the Attorney General, 115 Cong. Rec. 40024 (1969).

Section 2000e-5(g) of the act vests in the trial court broad equitable powers both to eliminate the vestiges of past discrimination and to terminate present discriminatory practices. *United States v. Ironworkers Local 86*, 443 F.2d 544, 553 (9th Cir. 1971), *cert. denied*, 404 U.S. 984, 30 L. Ed. 2d 367, 92 S. Ct. 447 (1971). Transitional affirmative relief authorized by section 2000e-5(g) of the act to insure that the continuing effects of past discrimination are overcome not infrequently is both appropriate and necessary. *NAACP v. Allen, supra* at 621; *Morrow v. Crisler*, 491 F.2d 1053, 1056 (5th Cir. 1974); *Carter v. Gallagher, supra* at 330-31; *Castro v. Beecher, supra* at 736. The fact that the City voluntarily has sought to achieve equality of employment opportunity in the public sphere rather than by court order does not detract from or lessen the legal validity and necessity of its affirmative action program under title 7. Voluntary compliance, rather than court ordered relief, is the congressionally preferred method of achieving equality of employment opportunity.

Selective certification coupled with the engineering department's policy of filling the first of every three vacancies with a qualified minority candidate is not only appropriate, but also essential to eradicate in the instant case the present effects of past discrimination. *Cf. United States v. T.I.M.E.-D.C., Inc.*, 517 F.2d 299, 319, 320 (5th Cir. 1975). It is not enough that employment procedures utilized by employers are fair in form. They must be fair in operation. *See Griggs v. Duke Power Co., supra* at 431.

The ethics of our society would judge people on their ability and their individualized worth. But past discriminatory practices incongruent with those same ethics and with the abstract, idealistic perfection of a color-blind society, envisioned by the Fourteenth Amendment, have left minor-

ities to varying degrees educationally and economically disadvantaged.

It may seem somewhat anomalous, at first glance, to aspire to equality by resorting to preferences or devices premised upon inequality, namely relief in the form of temporary quotas. Preferences are not alien to this society. It has long been recognized that the need or merit of certain individuals provides a politically and economically justifiable basis for preferential treatment. Kaplan, *Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment*, 61 Nw. U.L. Rev. 363, 364-65 (1966). For example, veterans are given preference in public employment; the handicapped, quite deservedly, are accorded many advantages, even to the extent of granting overtime parking privileges to some. RCW 46.61.580.

The thorny problem created by the use of temporary quota relief is that *this type of preferential treatment may tend to become permanently institutionalized*. Those minorities who benefit may only reluctantly give up the economic advantage that local, state, and federal governments have given them. Nevertheless, the basis and rationale for affirmative relief will disappear when the vestiges of past discriminatory effects *substantially are eliminated. Morrow v. Crisler*, 479 F.2d 960, 971 (5th Cir. 1973) (dissenting opinion); Blumrosen, *Quotas, Common Sense, and Law In Labor Relations: Three Dimensions of Equal Opportunity*, 27 Rutgers L. Rev. 675, 692 (1974); *see Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 31-32, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971); *NAACP v. Allen, supra* at 621; *Carter v. Gallagher, supra* at 330. Affirmative relief is designed to eliminate discrimination, but statistical perfection is not required. Once a *fair approximation* of minority representation in city employment consistent with the population mix in the area is achieved, affirmative relief is no longer necessary or appropriate. *See Swann v. Charlotte-Mecklenburg Bd. of Educ., supra* at 31-32; *Carter v. Gallagher, supra* at 330.

In the absence of rule 7.03 (j) (Seattle Civil Service

Laws and Rules), article 16, section 9 of the city charter would impair or frustrate the purpose of title 7 of the 1964 Civil Rights Act. The examinations used by the City to rank applicants for certification, as reflected by the record, have created in the past a substantial racial imbalance. There is no reason to suppose that these same examinations, until validated or shown to be job-related, will not continue to perpetuate discrimination in the City's public employment sector. State and local laws cannot stand if they impede, burden, or frustrate the purpose of title 7. *See Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 240, 19 L. Ed. 2d 438, 88 S. Ct. 362 (1967); *Hsieh v. Civil Serv. Comm'n*, 79 Wn.2d 529, 536, 488 P.2d 515 (1971). If it were not for the presence of rule 7.03 (j), article 16, section 9 of the city charter would violate the supremacy clause of the United States Constitution (U.S. Const. art. 6, cl. 2). We hold that the conflict between article 16, section 9 of the city charter and rule 7.03 (j) of the Seattle Civil Service Laws and Rules is excused because of the overriding provisions of title 7 of the Civil Rights Act of 1964.

■ Plaintiff next contends that the selective certification made in the instant case is violative of equal protection and due process guaranties. This contention need not be considered. Although the trial court in a judgment entitled "Summary Judgment of Dismissal" stated that under the Fourteenth Amendment the "City of Seattle has a legal duty to take affirmative action," the parties submitted an agreed statement of stipulated facts and issues of law to the trial court in which they agreed that "there is no constitutional question of equal protection of the laws and due process presented." It is apparent that the trial court did not consider the issue whether selective certification in the instant case violates the fourteenth amendment to the United States Constitution and article 1, section 3 of the Washington State Constitution. Under familiar principles of law, issues not considered by the trial court need not be considered on appeal.

*Kirkland v. New York State Dep't of Correctional Servs.,*

520 F.2d 420 (2d Cir. 1975), cited by plaintiff, is distinguishable even if we were to address the issue raised by this contention. There the court reversed a district court order which required the imposition of promotion quotas based upon the results of *one* civil service examination. The court concluded that the imposition of permanent quotas to eradicate the effects of past discriminatory practices was unwarranted because of the "paucity of the proof concerning past discrimination." We are not faced with that situation in the instant case.

■ Plaintiff next contends that the commission lacks the authority to delegate to the secretary the discretionary power vested in it by article 16, section 9 of the city charter to certify eligible candidates for appointment. In *Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 159, 500 P.2d 540 (1972), the court held that the delegation of legislative power is justified (1) when it can be shown that the legislature has provided standards which define in general terms what is to be done and the administrative body which is to accomplish it, and (2) when procedural safeguards exist to control arbitrary administrative action and abuse of discretionary power.

Article 16, section 4 of the city charter provides that the commission shall make "rules to carry out the purposes of this article, and for examinations, appointments, promotions, . . . and for seniority, transfers, demotions and removals." Article 16, section 15, provides that the secretary is to be the chief examiner and is to "perform such other duties as the Commission may prescribe." Rule 7.03(c)(1) of the Seattle Civil Service Laws and Rules provides:

> If a vacancy is to be filled from a promotional register, the Secretary shall certify to the appointing authority the names of the five available eligibles or 25% of the total available eligibles, whichever is greater, who stand highest on the appropriate register . . .

In order to make a selective certification under rule 7.03(j), a request in writing must be made by the appointing authority to the secretary that selective certification is neces-

sary in order to implement the affirmative action program; and the secretary must determine that the reasons given fully justify the request. Rule 2.05(a) provides that the commission may on its own motion review or modify any action or decision of the secretary. Rule 2.05(b) also provides that any person adversely affected by any action or decision of the secretary may request the commission to revise or modify such action or decision. These standards or guidelines carefully define what is to be done by the secretary and that he is vested with the obligation to make the certifications. Finally, procedural safeguards exist which allow either the commission or the individual adversely affected by the secretary's action to review or to request a hearing by the commission to revise or modify any action or decision. We are convinced that the conditions outlined in the *Barry* case are met in the instant case and that the challenged delegation of legislative power is valid.

Plaintiff finally contends that the City's affirmative action program is overly broad under existing federal or state requirements. It is contended that a joint policy statement issued by the Equal Employment Opportunity Commission, the Department of Justice, the United States Civil Service Commission, and the Department of Labor's Office of Federal Contract Compliance does not allow an affirmative action program to subordinate

> considerations of relative abilities and qualifications . . . to considerations of race, religion, sex or national origin in determining who is to be hired, . . . in order to achieve a certain numerical position [because such a program] has the attributes of a quota system which is deemed to be impermissible under the standards set forth.

Joint Policy Statement, March 23, 1973.

■ The policy statement specifically recognizes that "goals and timetables are in appropriate circumstances a proper means for helping to implement the nation's commitments to equal employment opportunities through affirmative action programs." A goal is defined to be a realis-

tic numerical objective fixed in relation to the number of expected vacancies and the number of qualified applicants available in the relevant labor pool. A goal, as opposed to an absolute quota or preference, does not subject an employer to sanction. An employer is not expected to displace existing employees or to create unneeded positions to meet his goal. An employer is never required to hire an unqualified applicant. None of the characteristics of an absolute quota or preference is present in the instant case. *See* Jones, *The Bugaboo of Employment Quotas*, 1970 Wis. L. Rev. 341, 378; Comment, *Developments in the Law: Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv. L. Rev. 1109 , 1301 (1971); *cf.* Opinion of the Attorney General, 115 Cong. Rec. 40024 (1969); *see also* Blumrosen, *Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination*, 71 Mich. L. Rev. 59, 102-06 (1972). In fact, several courts have required affirmative hiring relief by public agencies that have engaged in employment practices which have been shown to have a racially discriminatory impact. *See, e.g., Morrow v. Crisler*, 491 F.2d 1053 (5th Cir. 1974); *Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 490 F.2d 387 (2d Cir. 1973); *Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n*, 482 F.2d 1333 (2d Cir. 1973); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971), *modified on rehearing en banc*, 452 F.2d 327 (8th Cir.), *cert. denied*, 406 U.S. 950, 32 L. Ed. 2d 338, 92 S. Ct. 2045 (1972).

▆ With respect to state guidelines, WAC 162-18-040(2)[1] specifically recognizes that selective certification

---

[1]WAC 162-18-040(2) provides, in part:

"The purpose of a corrective employment program is to include persons of the underrepresented protected class into the employment process; not to exclude others from it. . . . It is permissible to ask for applicants of only the underrepresented protected class of persons from a particular source, or at a particular time, if other applicants are not excluded from the total hiring process but have access from another source, or are considered at another time."

712

may be the only effective method for a public employer to implement an affirmative action program. Where the legislature specifically delegates to an administrative agency the power to make rules, there is a presumption that such rules are valid, and the burden is upon the person asserting the invalidity to prove that the administrative agency abused its discretion in adopting the rule. *Weyerhaeuser Co. v. Department of Ecology*, 86 Wn.2d 310, 314, 545 P.2d 5 (1976). Plaintiff provides no evidence to support his contention, and we find that it lacks merit.

The judgment of the trial court should be affirmed. It is so ordered.

STAFFORD, C.J., and ROSELLINI, HUNTER, HAMILTON, WRIGHT, UTTER, BRACHTENBACH, and HOROWITZ, JJ.