[No. 8026–1–I. Division One. June 15, 1981.]

KAREN SKOLD, ET AL, *Respondents,* v. PHILLIP T.
JOHNSON, ET AL, *Respondents,* WASHINGTON
STATE HUMAN RIGHTS COMMISSION,
*Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *Winslow Whitman, Assistant,* for appellant.

*Edwards E. Merges* and *Steve Navaretta,* for respondents.

DURHAM, J.—The Washington State Human Rights Commission (Commission) appeals the Superior Court's remand of certain remedial portions of its hearing tribunal's order entered in this case involving alleged racial discrimination in the leasing of real property. The respondents Skold and Goble cross–appeal on other issues.

Douglas and Karen Skold, respondents and cross appellants, have owned the 24–unit Skold Apartments, located in Seattle's Capitol Hill area, since 1972. Elizabeth Goble, respondent and cross appellant, has been the resident manager since 1973.[1] A Commission tribunal hearing in July 1977 disclosed the following.

On June 15, 1975, Kenneth Davidson, a tenant living across the hall from Goble, mistakenly thought he heard his buzzer ring. He testified that when he opened his door, Goble, who was standing in her doorway, put her hands up and said, "'Don't answer it, they're colored' or something to that effect." He looked down the hall toward the main entrance and observed a black couple standing outside the glass doors. Davidson testified that Goble told him she was acting under orders from the Skolds to not open the door and show any apartments to blacks. He testified that Goble told him she would lose her job if she arranged for blacks to be interviewed by the Skolds, who usually interviewed all prospective tenants. Davidson testified that Goble indicated she knew her actions were illegal, but said she was only acting under orders.

About 1 week later, Davidson and Douglas Skold discussed Skold's rental policies. Davidson testified that Skold said Goble had not done anything wrong, but had acted the way he wanted her to act. According to Davidson, Skold said that the civil rights act was wrong and immoral, and

---

[1]Throughout the rest of this opinion, "Skolds" will refer to Douglas and Karen Skold and Elizabeth Goble, unless otherwise indicated.

that he would continue his practices rather than follow the
act. Davidson testified that Skold said he would rent to an
old, well recommended black woman, but that in so many
words, he did not want to interview blacks. Davidson, an
attorney who was active on civil rights committees of the
Seattle–King County Bar Association, testified he offered to
help Skold set up nonracial standards at no charge, but
Skold refused. Shortly thereafter, Davidson vacated his
apartment, and wrote a letter to the Commission reciting
these events.

In late July 1975, complainant Phillip T. Johnson
observed an apparent vacancy in the Skold Apartments
from the street. Although Johnson did not see a vacancy
sign, a man in the Skold parking lot indicated to Johnson
that there might be a vacancy. Johnson rang the manager's
buzzer and received no response on that day or the next.
The second day, he saw a sprinkler on outside the building,
and decided to wait in his car to see if someone would come
outside to turn it off. When Goble did so, Johnson
approached her and inquired about vacancies. Johnson tes-
tified that Goble said she was not the manager, "just the
cleaning lady." Johnson testified he was not sure if Goble
said he should come back to see the manager or not. John-
son testified that Goble's apparel appeared inappropriate
for a cleaning lady. He subsequently filed a complaint with
the Commission.

In early August 1975, Cynthia Wood and William Garvin,
two Commission staff members, went to the Skold Apart-
ments to conduct a housing test. Garvin testified that he
did not see a vacancy sign, but each testified they observed
an apparent vacancy from the street. When Wood, who is
white, rang the manager's buzzer alone, Goble responded.
Goble first said that the apartment had been rented, but
after a brief conversation, Goble showed Wood the apart-
ment and said she would contact the owners to determine if
it had been in fact rented.

As Wood was returning to her car, she was approached
by complainant Milton Jackson, a black. Jackson lived

across the street from the Skold Apartments and had observed Goble showing the apartment to Wood. When Jackson asked Wood if there was a vacancy, she replied that he should find out for himself. Jackson rang the manager's buzzer and received no response, although Goble, a gray–haired woman whom he recognized to be the manager, looked out into the hallway three or four times.

Garvin, who is also black, approached Jackson as he was leaving the building, identified himself as a Commission staff member, and told him he was going to check out the building. Garvin then rang the manager's buzzer, stood in front of the plate glass doors so he could be seen, and observed a gray–haired Caucasian woman "peep out around the corner." No one responded to Garvin's ring after three attempts. Garvin later took an affidavit from Jackson, who subsequently filed a complaint with the Commission.

Douglas Skold testified that he never told Kenneth Davidson that he refused to rent to blacks, but rather that in the past he had some "problems" with blacks but "mainly with younger people" of both races.[2] Skold testified that Davidson "seemed to turn everything [he said] into a discriminatory situation," but that he had told Davidson that he

> felt sympathetic to the blacks just as much as he did, and I felt that as a landlord I had done probably more than he had done to provide good housing on the same basis for them as anybody else, but that I had to take an application and treat the situation from a business point of view also.

Skold testified that very few blacks brought a rental application back. Skold testified that his building's general policy was that "if we didn't have a vacancy, we normally didn't answer the door." He stated that Davidson's apartment, although vacant, was not yet ready for rental when the Johnson and Jackson incidents occurred, due to the need for repairs and redecorating.

---

[2]During their ownership, the Skolds maintained rental agreements with three blacks.

Elizabeth Goble testified that she had never refused to take an application from a person because of race, creed, or color. She testified that there was no vacancy sign posted on the day of the Davidson incident, and that she had told Davidson that it was Sunday and she did not have to work on Sunday. She testified that she had indeed told Phillip Johnson that she was the cleaning lady, "which I am," further explaining that although there was a vacancy when Johnson inquired, she had not yet been told it was ready to be shown. Goble testified she told Johnson that he should come back that evening when the owners would be there.

The tribunal found that the respondents had a policy and practice of refusing to answer the manager's buzzer when rung by prospective black tenants, and that the evidence showed a pattern and practice of discrimination in rental policies on the basis of race that amounted to a conscious and intentional violation of the civil rights laws. It concluded that the respondents had committed unfair practices in real estate transactions because of race in violation of RCW 49.60.222(1) through (5).[3]

In an 8–paragraph order, the terms of which are significant upon appeal, the tribunal ordered relief that was virtually identical to what the Commission requested in its

---

[3]RCW 49.60.222 provides:

"It is an unfair practice for any person, whether acting for himself or another, because of sex, marital status, race, creed, color, national origin, the presence of any sensory, mental, or physical handicap, or the use of a trained dog guide by a blind or deaf person:

"(1) To refuse to engage in a real estate transaction with a person;

"(2) To discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith;

"(3) To refuse to receive or to fail to transmit a bona fide offer to engage in a real estate transaction from a person;

"(4) To refuse to negotiate for a real estate transaction with a person;

"(5) To represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to fail to bring a property listing to his attention, or to refuse to permit him to inspect real property;".

amended complaint.[4] Respondents were ordered to:

1. Cease and desist the unfair practices committed within the meaning of RCW 49.60.222(1), (2), (3), (4), and (5).

2. Pay to complainants Phillip T. Johnson and Milton Jackson the sum of one thousand dollars ($1,000) each for loss of the right to [be] free from discrimination in a real property transaction. RCW 49.60.225.

3. Notify Phillip T. Johnson and Milton Jackson by registered mail, with copies to the Washington State Human Rights Commission (1601 Second Avenue Building, Fourth Floor, Seattle, Washington (98101), Attn: Compliance Review Staffperson), of the first two vacancies to arise in the Skold Apartments. If Mr. Johnson or Mr. Jackson do not wish to rent the first two available apartments but desire to rent in the Skold Apartments anytime within two (2) years of entry of the final order in this cause, they shall retain a right of first refusal for all vacancies occurring during that period.

4. Post forthwith in a conspicuous place by the manager's apartment, an "Equal Opportunity in Housing" poster to be provided by the Washington State Human Rights Commission, which is clearly visible to all applicants for apartments at the Skold Apartments. The "Equal Opportunity in Housing" poster shall remain posted in accordance with this paragraph for a period of two years.

5. Indicate every vacancy occurring in the Skold Apartments for the next three (3) years by posting in a conspicuous place a "Vacancy" sign immediately upon the occurrence of such vacancy.

6. Within thirty (30) days of entry of the tribunal's final Order, file with the hearing tribunal, and serve upon counsel for the Commission, proposed written objective nonracial standards and criteria for the processing and approval of applications for apartments at the Skold Apartments. Counsel for the Commission shall have ten (10) days within which to file objections with the hearing tribunal regarding the proposed standards and criteria. If no objections are made by counsel for the Commission, the hearing tribunal will approve entry of an Order

---

[4]The Commission filed an amended complaint that amended the complaints of Johnson and Jackson.

implementing said standards and criteria. If counsel for the Commission object to the proposed standards and criteria, the hearing tribunal will hold a prompt hearing with respect to the adequacy of respondents' proposed standards, and with respect to the Commission's objections thereto, and will order the implementation of objective standards and procedures either as proposed by respondents or otherwise. The hearing tribunal shall retain jurisdiction of this cause to implement this remedy.

7. For a period of three (3) years following entry of the final Order in this cause, maintain records of the following information regarding the Skold Apartments:

(a) The name, address, and apparent race of each person making inquiry about the availability of apartments;

(b) In the case of each person listed [as required by (a)], whether such person:

(i) was interviewed, and/or filled out and submitted an application;

(ii) was notified of the nonracial standards and criteria respondents use in choosing applicants;

(iii) made a deposit, was accepted for a waiting list, or was accepted for an occupancy;

(iv) was rejected, and if rejected, the reason or reasons therefore, and the specific objective criterion which the applicant failed to meet;

(v) the date on which each of the foregoing actions was taken.

Representatives of the Commission shall be permitted to inspect and copy all records kept in accordance with this paragraph, at any and all reasonable times. The Commission shall endeavor to minimize any inconvenience to respondents from the inspection of such records.

8. Affirmatively solicit Black prospective tenants for all future vacancies in the Skold Apartments, until the racial composition of tenants adequately and proportionately reflects the racial composition of the community in which the Skold Apartments are located. This requirement will not be deemed to have been breached if respondents can demonstrate a nondiscriminatory reason for failure to achieve such a representative racial composition.

Skolds petitioned the Superior Court to review the tribunal order. The Superior Court affirmed all of the tribunal's

35 findings of fact, with one addition. Paragraphs 1 (cease–and–desist order) and 4 ("Equal Opportunity in Housing" poster) of the tribunal order were the only remedial provisions that were affirmed. The other paragraphs of the tribunal order were either deleted, rewritten, or remanded with specific instructions.[5]

COMMISSION'S APPEAL

 At the outset, we note that the Washington State Human Rights Commission is an "agency" within the meaning of the administrative procedures act, RCW 34.04. *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n*, 87 Wn.2d 802, 557 P.2d 307 (1976). The decisions of its hearing tribunals are reviewable only under RCW 34.04.130. *Loveland v. Leslie*, 21 Wn. App. 84, 583 P.2d 664 (1978). That statute provides:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
> (f) arbitrary or capricious.

RCW 34.04.130(6). The statute does not give courts any power to modify an agency decision.[6] A court may, how-

---

[5]The trial court's remand, which included detailed instructions as to how the tribunal should rewrite certain paragraphs of its order, was, in effect, a modification of the tribunal order. *See* F. Cooper, *State Administrative Law* 773 (1965).

[6]Unlike the Model State Administrative Procedure Act § 15(g), *see* 14 U.L.A. 430 (Master. ed. 1980), Washington's statute does not expressly allow a court to modify an administrative order in a contested case. *See* RCW 34.04.130(6). Both parties have cited *Arnett v. Seattle Gen. Hosp.*, 65 Wn.2d 22, 395 P.2d 503 (1964), for the rule that a court may modify a tribunal order under some circumstances.

ever, remand a case for further proceedings where no grounds for reversal are necessarily present, but the court, based upon its review of the record, is not satisfied that the agency is right, and a "second look" is required. *State ex rel. Gunstone v. State Highway Comm'n,* 72 Wn.2d 673, 434 P.2d 734 (1967). On appeal, the appropriate standard of review is applied directly to the record of the administrative proceeding. *Levold v. Department of Employment Security,* 24 Wn. App. 472, 604 P.2d 175 (1979); *Ross v. Department of Social & Health Servs.,* 23 Wn. App. 265, 594 P.2d 1386 (1979).

 As neither party challenges any of the tribunal's findings of fact, they are the established facts of this case. *Lakeside Pump & Equip., Inc. v. Austin Constr. Co.,* 89 Wn.2d 839, 576 P.2d 392 (1978). The only issues before us in the Commission's appeal concern paragraphs 2, 5, 6, 7, and 8 of the tribunal order, each of which imposes a different remedy.[7] Before reviewing these paragraphs, it is appropriate to discuss the nature and extent of administrative remedial powers, in general, and those of the Washington State Human Rights Commission, in particular.

 Generally, the relation of remedy to policy is peculiarly a matter for administrative competence. *State ex rel. Wash. Fed'n of State Employees v. Board of Trustees,* 93 Wn.2d 60, 605 P.2d 1252 (1980). Remedies imposed by the legislatively designated agency to enforce a statute should be accorded considerable judicial deference. *State ex rel. Wash. Fed'n of State Employees v. Board of Trustees, supra.* Such a rule is consistent with the well established

---

*See Arnett,* at 29–30. Such a rule is no longer viable in the discrimination context now that the Commission is considered an "agency" within the meaning of the administrative procedures act, *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976), and now that it has been determined that RCW 34.04.130 controls over RCW 49.60.270, *Loveland v. Leslie,* 21 Wn. App. 84, 583 P.2d 664 (1978).

[7]The Commission's assignment of error concerning paragraph 3 was unsupported by citation of authority or legal argument, and thus will not be considered. *Hamilton v. State Farm Ins. Co.,* 83 Wn.2d 787, 523 P.2d 193 (1974).

principle that a reviewing court may not substitute its own judgment for that of an administrative tribunal acting within the sphere of its expertise. *Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n,* 83 Wn.2d 446, 518 P.2d 1237 (1974); *Spokane County Fire Protection Dist. 8 v. Spokane County Boundary Review Bd.,* 27 Wn. App. 491, 618 P.2d 1326 (1980).

A hearing tribunal's power to fashion a remedy under RCW 49.60 is admittedly broad. Upon finding that a respondent has engaged in an unfair practice, the statute requires the tribunal to take such action "as, *in the judgment of the tribunal,* will effectuate the purposes of [the] chapter . . ." (Italics ours.) RCW 49.60.250. A Commission tribunal thus has the duty to determine what remedy is required in a specific situation to carry out the declared policy of the act. *Arnett v. Seattle Gen. Hosp.,* 65 Wn.2d 22, 395 P.2d 503 (1964). It has also been held that the Commission may pursue any reasonable remedy it deems appropriate in order to eliminate discriminatory practices. *Mattox v. State Bd. Against Discrimination,* 13 Wn. App. 406, 535 P.2d 470 (1975).

Under the regulations promulgated by the Commission, a tribunal order should generally aim to both eliminate the effects of an unfair practice and prevent its recurrence, WAC 162–08–298(2), which, under RCW 49.60.010, are the dual purposes of the Law Against Discrimination. The regulations provide that a Commission tribunal may make any order that will effectuate the purposes of the Law Against Discrimination, that complies with the Commission's rules, and that is not otherwise prohibited by law. WAC 162–08–298(4).

We turn now to apply the appropriate standard of review under RCW 34.04.130(6) directly to the record of the tribunal hearing. The Commission urges us to affirm the tribunal order. The Skolds urge us to remand paragraphs 2, 5, and 7 for further proceedings, and to reverse paragraphs 6 and 8 as being arbitrary and capricious. RCW 34.04.130(6)(f). The Skolds further contend that paragraph 8 is reversible as

being unconstitutional, RCW 34.04.130(6)(a), made upon unlawful procedure, RCW 34.04.130(6)(c), and clearly erroneous, RCW 34.04.130(6)(e).[8]

### Paragraphs 2, 5, and 6

Each of the remedies imposed in paragraphs 2, 5, and 6 of the tribunal order was within its statutory authority, as discussed earlier. Those paragraphs are affirmed.

The monetary awards imposed by paragraph 2 are based simply upon the loss of the right to be free from discrimination in a real property transaction. RCW 49.60.225; WAC 162-08-298(4)(n). The tribunal's imposition of the maximum allowable award is supported by its unchallenged finding that the Skolds' racially discriminatory practices were conscious and intentional. *See Rody v. Hollis*, 81 Wn.2d 88, 500 P.2d 97 (1972).

With respect to paragraph 5, concerning vacancy signs, and paragraph 6, concerning written objective nonracial standards, we shall not substitute our judgment for that of the tribunal. Paragraph 6 is not arbitrary or capricious, as the Skolds contend, unless the substantial rights of the Skolds "may have been prejudiced". RCW 34.04.130(6). The Skolds are benefited by being able to draw up their own set of standards rather than being subjected to a set of standards imposed upon them by the tribunal. *See United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 228-29, 13 A.L.R. Fed. 269 (5th Cir. 1971).

### Paragraph 7

The tribunal ordered the Skolds to maintain detailed records for 3 years on all rental applicants and all individuals even inquiring as to the existence of vacancies. The trial court remanded and revised paragraph 7 to require the Skolds to simply furnish copies of all rental applications to the Commission, together with sufficient data on their dis-

---

[8]The "clearly erroneous" standard of review is inappropriate in this case because no questions of fact are involved. *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974).

position and the reasons therefor. The Skolds contend that this remand should be affirmed because the record–keeping methods ordered by the tribunal are of doubtful validity. The Commission contends that paragraph 7 is necessary because it needs some way of determining if the Skolds are accepting rental applications from blacks.

The Commission further argues that our remand power under *State ex rel. Gunstone v. State Highway Comm'n, supra,* is limited to situations where the evidence is incomplete to support the agency's decision, or where the agency has failed to consider a viable alternative. Inasmuch as RCW 34.04.130 does not give our courts the power to modify an administrative order, we do not think that *Gunstone* should be construed so narrowly. *Gunstone* affirmed an order of remand, holding that a remand does not have to be justified by any of the grounds for reversal enumerated in RCW 34.04.130(6)(a)–(f). As the court stated:

> The provision for such a remand would seem to be intended as a safety valve, permitting the reviewing court to require a second look at situations and conditions which might not warrant a reversal, but which, to the court reviewing the record, would indicate to it that the [administrative agency] may have acted on incomplete or inadequate information; or may have failed to give adequate consideration to an alternat[ive]; or may have weighted its evaluation of the matter under consideration with the theory of the complete infallibility of its own [staff].
>
> A remand for further consideration is not a determination that the [administrative agency] is wrong; but it is an indication that the disinterested court, which has reviewed the record, is not satisfied on the basis of that record that the [administrative agency] is right.

*Gunstone,* at 674–75.

We are unable to simply affirm the trial court's remand, which was with specific instructions, because the appropriate standard of review is applied directly to the record of the administrative proceeding. Nevertheless, we share the trial court's view that paragraph 7 is "unnecessarily burdensome and most likely unenforceable." Paragraph 7

requires the Skolds to ask each person *merely inquiring* if any vacancies exist, their name, address, and race. This includes all oral inquiries, whether in person or by telephone, no matter how casual the encounter. As the trial court commented, "[m]ost people may not be willing to give such personal information over the phone and they should not be required to do so." Such a practice would involve the risk of discouraging minority applicants, and thus thwart the purposes of RCW 49.60.

Inasmuch as the tribunal appears to have failed to give adequate consideration to alternative requirements, *see Gunstone,* at 675, we remand paragraph 7 to the tribunal for its further consideration.

### Paragraph 8

The tribunal ordered the Skolds to "[a]ffirmatively solicit" black tenants until the racial composition of tenants "adequately and proportionately reflects the racial composition of the community in which the Skold Apartments are located." The Skolds contend that paragraph 8 creates a constitutionally impermissible quota under *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978), and that it is arbitrary or capricious under RCW 34.04.130(6)(f). The Commission contends that no allocation of units by race, or any question of constitutionality, is involved, and it denies that the relief ordered is arbitrary or capricious.

The Commission tribunal can clearly order some form of affirmative relief. The regulations provide that one permissible remedy is:

> An order to institute affirmative programs, practices, or procedures that will eliminate an unfair practice or its effects, or will prevent the recurrence of the unfair practice;

WAC 162-08-298(4)(q). This regulation is unchallenged here. Thus, insofar as paragraph 8 requires the Skolds to "[a]ffirmatively solicit Black prospective tenants for all future vacancies in the Skold Apartments," it is consistent

with the regulations, and is affirmed.

The remainder of paragraph 8, however, provides that the Skolds must affirmatively solicit black tenants "until the racial composition of tenants adequately and proportionately reflects the racial composition of the community in which the Skold Apartments are located." We are unaware of any court ever requiring a small, private apartment house owner to make the racial balance of his apartment house reflect the surrounding community. Even *United States v. West Peachtree Tenth Corp., supra,* which has been considered a model for formulating relief in housing discrimination cases, including this one, did not go so far. The sole authority cited by the Commission in its statement of additional authorities, *Williamsburg Fair Housing Comm. v. New York City Housing Auth.,* 493 F. Supp. 1225 (S.D.N.Y. 1980), is readily distinguishable.[9]

Even if there were sufficient legal authority upon which to impose a racial balance requirement, such a requirement would need to be clear enough to insure full compliance and fair enforcement. Although the tribunal order itself does not describe any particular racial goal, unchallenged finding of fact No. 27 provides that "[t]he racial composition of the community surrounding the Skold Apartments was between 3½% and 35% Black." This range is so broad that it provides virtually no guidance. Applied to a 24–unit apartment building, it is almost meaningless.

Moreover, the question of what properly constitutes the surrounding community would still remain. The tribunal apparently considered the "Capitol Hill–Madison" and "Garfield–Madrona" *groupings* of census tracts as the sur-

---

[9]*Williamsburg Fair Housing Comm. v. New York City Housing Auth.,* 493 F. Supp. 1225 (S.D.N.Y. 1980), involved a consent decree. The defendants had originally rented their units according to a quota: 75 percent white, 20 percent Hispanic, and 5 percent black; and special preferential treatment was accorded to whites. The consent decree proscribed the use of quotas, but provided for interim "adjustment periods" until the percentage of white to nonwhite tenants reached a certain level. The main issue involving relief was the appropriateness of a permanent injunction, not the use of "adjustment periods." *Williamsburg* is thus quite dissimilar factually from the case before us.

rounding community, since the Skold Apartments is located on the border. Exhibit C–22 indicates that these two groupings embrace the entire area east of downtown Seattle and Lake Union, bordered on the north by the University-Ravenna district, on the south by the Beacon–Rainier Valley district, and on the east by Lake Washington. The reason why the tribunal chose such an immense area for comparison totally eludes us. The evidence shows that had the tribunal used population figures from the census tract for the Skold Apartments (tract No. 74) and the two immediately adjoining tracts (tracts Nos. 65 and 75) it would have arrived at a black resident population of between 2.15 percent and 3.94 percent. See exhibits C–21, C–23.

We conclude that the tribunal's action in imposing a racial balance requirement in paragraph 8 constitutes willful and unreasoning action in disregard of the facts and circumstances. *See English Bay Enterprises, Ltd. v. Island County,* 89 Wn.2d 16, 568 P.2d 783 (1977); *Northern Pac. Transp. Co. v. State Utils. & Transp. Comm'n,* 69 Wn.2d 472, 418 P.2d 735 (1966). That portion of paragraph 8 is thus arbitrary and capricious and is reversed. The purposes of RCW 49.60.222 are completely satisfied by the other relief provided for in the tribunal order. In light of our holding, it is unnecessary for us to reach the issue of the constitutionality of this provision.

## Cross Appeal

On cross appeal, the Skolds raise two issues involving the "appearance of fairness" doctrine, which applies to the Commission tribunal and is compatible with RCW 34.04-.130(6)(c), allowing reversal of agency decisions "made upon unlawful procedure". *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976). These issues, which may be discussed together, are: First, does the interrelationship between WAC 162–08–278(7), concerning the law the tribunal shall apply, and WAC 162–08–211(6), concerning the law each tribunal

member agrees to apply, create the impression that tribunal members are "psychologically wedded" to the Commission and its view of the law, thus denying the appearance of fairness? Second, does the "Acceptance of Appointment" form prescribed for each tribunal member in WAC 162–08–211(6) violate the appearance of fairness doctrine by requiring tribunal members to follow and apply the Law Against Discrimination, rather than to support the federal or state constitution?

WAC 162–08–278(7) provides that the tribunal shall apply the Law Against Discrimination, and give persuasive authority to other law:

> In determining whether unfair practices have been committed, the hearing tribunal shall apply the law as it is written in chapter 49.60 RCW and as it has been interpreted by final decisions of appellate courts and by the Washington State Human Rights Commission in regulations, declaratory rulings, and other formal interpretations made by vote of the commissioners. Court decisions interpreting statutes other than chapter 49.60 RCW, rulings of other hearing tribunals, interpretations of law by the commission's staff or legal counsel, and arguments of legal counsel for the commission or other parties shall be given whatever persuasive weight they possess, in the judgment of the tribunal.

WAC 162–08–211(6) requires each tribunal member to execute an "Acceptance of Appointment" form, stating:

> "I accept appointment as a member of the hearing tribunal which will hear the case captioned above for the Washington State Human Rights Commission.
>
> I certify that, to my knowledge, I have no conflicts of interest which would interfere with my ability to judge fairly and impartially.
>
> I promise to judge this case with fairness and impartiality to all parties and persons.
>
> I agree with the purposes of the law against discrimination and I will follow and apply the law against discrimination and the regulations, declaratory rulings, and other formal interpretations of the law against discrimination made by vote of the commissioners.
>
> I am willing to devote the time necessary to fully

hear the case and decide it with reasonable prompt-
ness.

Dated _____

(Signature)

We believe that the cross appellants are really ask-
ing this court to find that a Commission hearing tribunal
violates the appearance of fairness doctrine *as a matter of
law* by applying the Law Against Discrimination, RCW
49.60. The legislature, however, created the Commission
and empowered it to "receive, investigate, and pass upon
complaints" coming under that chapter. RCW 49.60.120(4).
Although the legislature combined the Commission's inves-
tigative and adjudicatory functions, it also furnished
appropriate safeguards to ensure that no individual tribu-
nal member comes from the ranks of those who investi-
gated the case. *See* RCW 49.60.230–.250. There is no
contention here that any individual tribunal member
transgressed these statutory safeguards, or prejudged the
facts of this case. The law, unlike the facts, cannot be "pre-
judged"; the law is merely applied to the facts as found by
the tribunal. We do not agree with the Skolds that WAC
162–08–211(6) limits the law to be applied by the tribunal,
and, in fact, the tribunal's written decision cited numerous
federal cases. Inasmuch as the Skolds have not shown how
their substantial rights may have been prejudiced either by
the law applied by the tribunal in this case, or by the fail-
ure of the tribunal members to promise to support the fed-
eral or state constitution, we have no basis for finding any
reversible error. RCW 34.04.130(6).

The Skolds next contend that the hearing before the
Commission tribunal is void because the Commission failed
to make a *good faith* attempt to conciliate prior to the
hearing. In *Loveland v. Leslie,* 21 Wn. App. 84, 88, 583
P.2d 664 (1978), this court held that the provisions of RCW
49.60.240[10] are jurisdictional and "require a showing that

---

[10]RCW 49.60.240 provides:

the Commission conducted conciliation endeavors in good faith." The Commission tribunal merely found that the Commission staff attempted to eliminate the unfair practices "by conference, conciliation and persuasion" in accordance with RCW 49.60.240. However, in its written decision, which is expressly incorporated by reference in its findings and conclusions, the tribunal stated that uncontroverted testimony, including the affidavit of Commission staff member Marlene Reich, "demonstrated that a good faith effort to conciliate was made." Our review of the record leads us to the same conclusion.

Finally, the Skolds contend that the Commission did not meet its burden of proving that the Skolds had engaged in the unfair practices. The record sufficiently demonstrates the contrary.

The judgment of the trial court is affirmed in part and reversed in part. The case is remanded to the Commission tribunal for further proceedings consistent with this opinion.

JAMES, C.J., concurs.

RINGOLD, J. (concurring in part, dissenting in part)—I concur in the affirmance of paragraphs 2, 5 and 6 of the tribunal's order. I join the majority's decision to sustain the affirmative solicitation requirement of paragraph 8. I concur in the remand of paragraph 3 of the tribunal's order only because this issue was not argued by the Commission on appeal. I also concur in the rejection of the cross appeal. I dissent from the majority's remand of paragraph 7 and the conclusion that the racial balance requirement in paragraph 8 is arbitrary and capricious. Regrettably, on those matters, my colleagues have improperly substituted their judgment for that of the tribunal.

---

"If the finding is made [by the Commission staff] that there is reasonable cause for believing that an unfair practice has been or is being committed, the board's [Commission's] staff shall immediately endeavor to eliminate the unfair practice by conference, conciliation and persuasion."

The issue here is narrow. Goble and the Skolds unquestionably discriminated against potential black tenants contrary to the law and public policy of the State of Washington. The only dispute concerns the remedies ordered by the tribunal. The majority correctly states that the tribunal has broad discretion in fashioning remedies designed to effectuate the purpose of RCW 49.60, but the opinion ignores WAC 162-08-298(9) which provides in part:

> The tribunal is not required to observe conventional common law or equity principles in fashioning its order. The guiding principle for the tribunal is whether a particular remedy will effectuate the purposes of the law against discrimination.

My colleagues, disregarding their own statement of the law and misapplying *State ex rel. Gunstone v. State Highway Comm'n,* 72 Wn.2d 673, 434 P.2d 734 (1967), substitute their view of public policy for that of the tribunal under the guise of remanding to consider alternative remedies and to correct arbitrariness. In my view these defects are not present in the tribunal's order. I would reverse the trial court and reinstate the tribunal's remedies.

## Paragraph 7
### RECORDS OF INQUIRIES

The majority remands the 3-year record-keeping requirement to consider alternative remedies because the order is of doubtful validity and unnecessarily burdensome. *Gunstone,* however, does not support a remand on these grounds. It authorizes a remand where the reviewing court cannot say the agency was right because the record is insufficient to permit review. The majority relies on *Gunstone's* authorization of a remand to consider an alternate route. In *Gunstone,* the State Highway Commission rejected a shorter proposed route for a highway based on cost estimates by the State's engineers. The Supreme Court could not review those estimates because the record lacked an evidentiary basis for them. Without evidence to sustain the engineers' opinion, the record lacked any explanation of

why the Commission rejected the shorter route. Here, however, the record contains a full explanation for the decision to impose record–keeping requirements. The tribunal made extensive findings concerning the Skolds' conduct and rejected less burdensome record keeping because of the seriousness of their offense. The tribunal stated in its written opinion:

> In many cases, these requirements would be unduly burdensome. However, they are appropriate in the present case because of the nature of the offense and the fact that most of the information is already kept by the Skolds.

The real issue is whether the findings and resulting order are arbitrary and capricious. If my colleagues "doubt" the "validity" of the order they should address that issue under the proper test because we have an adequate record for review.

The majority's objection focuses on the requirement of maintaining records about oral inquiries. They fear unreasonable invasions of privacy and a deterrence of minority applicants. The order, however, does not require the Skolds to inquire about an applicant's race. It merely directs the maintenance of records about "apparent race." The record does not support the majority's speculative concern that the order may offend applicants and thwart the antidiscriminatory purpose of the law.

I find the remedy to be within the tribunal's administrative competence. The Skolds' conduct was sufficiently serious to sustain the tribunal's view that records of telephone and other oral inquiries are necessary to deter future discrimination.

The hearing tribunal's unchallenged findings state:

> 25. The testimony of Johnson, Jackson, Wood, Garvin, Davidson, Goble and the Skolds demonstrated a pattern and practice of discrimination in rental policies on the basis of race.
> 26. The racially discriminatory rental policies of the respondents was [sic] conscious and was [sic] an intentional violation of the Civil Rights Laws.

. . .

28. Both of the Black tenants residing in the apartments when the Skolds became owners have left. In five years of ownership, the Skolds have had 71 vacancies (a 300% turnover), and have rented to one Black at most. [The record reflects the Skolds rented to the one Black tenant after the complaint to the Commission.]

. . .

30. The various non–discriminatory explanations the Skolds suggested for their lack of Black tenants was unconvincing, totally incredible and unbelievable.

31. The respondents, Goble and Skolds, had a policy and practice of refusing to answer the manager's buzzer when rung by prospective Black tenants.

If only written applications were subject to record–keeping requirements, the Skolds could easily continue these discriminatory practices.

The need to eradicate the evil effects of prior discrimination and to prevent future discriminatory practices justifies the tribunal's use of record–keeping requirements. *Louisiana v. United States,* 380 U.S. 145, 13 L. Ed. 2d 709, 85 S. Ct. 817 (1965). The tribunal could have reasonably concluded that records of oral inquiries were necessary to monitor the Skolds' compliance, particularly where they unquestionably have maintained an intentional pattern or practice of excluding Blacks and have given the tribunal no reason to believe they will voluntarily terminate their wrongful conduct. *See United States v. Jamestown Center–in–the–Grove Apartments,* 557 F.2d 1079 (5th Cir. 1977); *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 13 A.L.R. Fed. 269 (5th Cir. 1971); *United States v. Youritan Constr. Co.,* 370 F. Supp. 643 (N.D. Cal. 1973), *modified as to other relief and aff'd,* 509 F.2d 623 (9th Cir. 1975). It is of no concern to a reviewing court that alternative remedies might be more appropriate where, as here, there is a sufficient basis for the tribunal's order. *Insurance Co. of N. America v. Kueckelhan,* 70 Wn.2d 822, 425 P.2d 669 (1967); *In re Case E–368,* 65 Wn.2d 22, 395 P.2d 503 (1964) (cited by majority as *Arnett v. Seattle Gen. Hosp.*).

## Paragraph 8
### RACIAL BALANCE

The majority strikes a portion of paragraph 8 that requires the Skold Apartments to attain a racial composition that reflects the surrounding community. My colleagues rely on a supposed lack of authority for this remedy, but ignore the tribunal's broad authority to fashion affirmative relief, WAC 162–08–298(4)(q), and its authority to order any remedy available under comparable civil rights laws of the United States or other states, WAC 162–08–298(4)(r). As stated in the last paragraph of the list of possible remedies in WAC 162–08–298:

> This list is not exhaustive. A tribunal may make any order that will effectuate the purposes of the law against discrimination, that is in compliance with the rules of the commission, *and that is not otherwise prohibited by law.*

(Italics mine.) The majority, therefore, must demonstrate that this remedy "is not otherwise prohibited by law." Under the Commission's regulations, nothing is proved by my colleagues' reliance on a lack of authority.

The majority also finds no support for the tribunal's selection of a large surrounding area as the relevant community. In today's mobile society, however, the area chosen by the tribunal is more reasonable than the majority's convenient selection of small nearby census tracts with small black populations. The finding that about half of the inquiries concerning vacancies were from Blacks is undisputed by the Skolds and further supports a conclusion that applicants were drawn from a greater area than the predominantly white nearby census tracts.

The majority disapproves of the supposedly vague racial balance goals. My colleagues analyze this issue without quoting or discussing the last portion of the order in paragraph 8.

> The Commission may, at any time after one (1) year but not later than three (3) years following entry of the tribunal's final Order, file objections that the respondents have failed to comply with this paragraph. The hearing

tribunal shall retain jurisdiction of this cause in order to conduct a hearing with respect to such objections, if a hearing is deemed necessary.

This provision, coupled with the record–keeping requirements, demonstrates that the tribunal imposed no racial balance goals and that the proper measure of an adequate racial composition will turn on future events, including the percentage of black applicants.[11] The order contemplates a cooperative effort by the Commission and the Skolds to achieve a reasonable racial balance in the apartment building. It is not the judiciary's role to intervene at the implementation stage and require the tribunal to set a more precise goal. The tribunal has the discretion to delegate to the Commission the duty to monitor the Skolds' conduct. If the Commission is dissatisfied with the Skolds' efforts, it must request a hearing and, if necessary, seek a racial balance goal. This flexibility is commendable, not arbitrary and capricious. The order provides further flexibility by avoiding a quota and excusing the Skolds from noncompliance if they show nondiscriminatory reasons for failing to achieve a representative racial composition.

This remedy is not arbitrary and capricious. The tribunal could reasonably conclude from the record that a racial balance requirement was essential to deter future discrimination. Even record–keeping requirements are not foolproof and can easily be violated when oral inquiries occur.[12] With the Skolds' record of discrimination and their desire to continue their conduct, it was consistent with the Commission's regulations, and constitutional, to adopt a remedy available under comparable civil rights laws and impose a

[11]This highlights the necessity of paragraph 7's record–keeping requirement.

[12]There was evidence before the tribunal that after the filing of the complaints in this case, the Skolds installed a viewer in Mrs. Goble's apartment door for her personal safety. The viewer allows the manager to observe a person at the outer door of the building without opening the door. Previously, Mrs. Goble's refusal to respond to Blacks was noticeable because she had to open her apartment door. The tribunal could have inferred that there was a risk the new viewer might be used to continue this practice without anyone's knowledge.

general and flexible goal designed to achieve racial balance in the apartment building. WAC 162–08–298(4)(r); *see Maehren v. Seattle,* 92 Wn.2d 480, 599 P.2d 1255 (1979); *Lindsay v. Seattle,* 86 Wn.2d 698, 548 P.2d 320, *cert. denied,* 429 U.S. 886, 50 L. Ed. 2d 167, 97 S. Ct. 237 (1976); *EEOC v. Local 638,* 565 F.2d 31 (2d Cir. 1977); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), *cert. denied,* 404 U.S. 984, 30 L. Ed. 2d 367, 92 S. Ct. 447 (1971); *see also Fullilove v. Klutznick,* 448 U.S. 448, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980). The tribunal, not this court, is the proper forum for determining the best means of effectuating public policy in this area. It is irrelevant that the majority prefers a different result.

The legislature decreed in RCW 49.60.010 that the practice of racial discrimination "threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." The tribunal is vested with the authority to determine the means of eliminating the discrimination in this case, and this court should not substitute its judgment for that of the legislature and the tribunal. I would reverse the trial court and reinstate the order without requiring further proceedings.

Reconsideration denied July 21, 1981.

Review denied by Supreme Court September 25, 1981.